STATE BANK OF WELLSTON v. G. C. HAFFERKAMP, C. F. BLANKE,
GEORGE W. MAXWELL and GEORGE R. COLLETT, Appellants.

Division One, July 30, 1926.

1. **APPELLATE PRACTICE: Action at Law or in Equity.** Where the
parties at the trial assumed that the cross-bills had converted the action at
law into a suit in equity, it will be so treated on appeal.

2. **NOVATION: Collateral Note.** Acceptance, by the payee of notes, of
the individual note of one of the indorsers as collateral security, and his
subsequent payment of the interest on the notes as it became due, did not
constitute a novation, and did not release the other indorsers from their
obligation to pay the notes.

3. **NEGOTIABLE NOTE: Accommodation Maker: Surety: Principal Deb-
tors.** A corporation having given to a bank its notes indorsed by its direc-
tors, and having ceased to function new notes in lieu thereof signed by a
"straw man" as maker and indorsed by the same directors and one other,
the "straw man" was a mere accommodation maker and therefore a surety,
and the indorsers were co-obligors or principal debtors.

4. ———: **Substitution of Collateral Note: Discharge: Intention.** Whether
the giving by an indorser of his individual note in an amount equal to other
notes held by the payee was a discharge of such other notes is a matter of
intention, and the indorser's individual note cannot be held to be a dis-
charge where he and the payee explicitly deny that it was intended to be a
discharge. And that it was not intended to be a discharge may be further
established by the facts themselves.

5. ———: **Extension: Indorsers: Co-obligors.** A taking by the payee of
the individual note of one of several indorsers as collateral security for notes
sued on and the acceptance of interest from him as it became due do not
constitute such an extension of the notes as releases other indorsers. Such
agreement has no greater legal effect than a covenant not to sue such in-
dorser for a specified time. Any one of the indorsers, being co-obligors,
notwithstanding such agreement, could have paid the notes at any time and
then sued him for contribution.

6. ———: **Waiver of Protest and Demand: Further Forbearance.** A pro-
vision in a negotiable note that "demand for payment, protest and notice of
dishonor are hereby waived by all parties" fixes the liability of the makers
and indorsers at its maturity without the taking of further steps, and re-
lieves the payee of the duty to demand payment of principal or interest,
or to give them notice of their outstanding obligations to pay, and further
indulgence or forbearance or failure to sue after maturity does not operate
to release any of them from liability.

7. ———: ———: **Promise of Indorser to Pay: Notice.** A promise by an
indorser to his co-obligors to pay a note does not place upon the payee the
duty to notify such promises of the promisor's failure to perform, but is a
matter that concerns him and them alone.

8. ———: **Indorsers: Successive Liability.** The statute (Sec. 836, R. S.
1919) relating to the liability of indorsers of a promissory note in the order
in which their names appear on the paper, has no application where the
note was not negotiated and there were no intervening parties and all the
indorsers were in effect joint indorsers.

315 Mo.—30.

9. ———: **Pledge to Secure Indorser's Collateral Note: Conformity to Banking Rules: Discharge: Intention.**  Where the notes sued on had been executed by an accommodation maker and indorsed by numerous persons, and one of them, after the notes matured, paid the interest and gave his individual note to the payee for the same amount, which recited a pledge to the payee of such notes "as collateral security," it is possible to construe such recital as a showing that the notes were taken up by said indorser and re-issued by him in the form of a pledge to secure his own note; but such construction is not a necessary one, and in this case the evidence convincingly shows that it was not the intention of either of the parties that the notes should be discharged as by payment or that the ownership of the notes should be transferred to said indorser, but it was merely intended that they should be subordinated to the position of collateral paper, so that the debt for which they had been given could be carried conformably to banking rules; and no rule of law forbids giving effect to that intention.

Corpus Juris-Cyc. References:   **Appeal and Error,** 4 C. J., Section 2556, p. 662, n. 82.   **Bills and Notes,** 8 C. J., Section 400, p. 254, n. 73; Section 429, p. 275, n. 95 New; Section 456, p. 291, n. 75; Section 565, p. 380, n. 77; p. 381, n. 83; Section 979, p. 698, n. 85; Section 983, p. 699, n. 7.   **Novation,** 29 Cyc., p. 1131, n. 14; p. 1134, n. 24.

Appeal from St. Louis County Circuit Court.—*Hon. G. A. Wurdeman,* Judge.

Affirmed.

*Borders & Davis* and *Alphonso Howe* for appellants.

(1) In equity cases, it is the right and the duty of the appellate court to review the facts, as well as the law.  The present case is a suit in equity, because, when a defendant files an answer to a suit at law containing an equitable defense and asking for affirmative relief, it is converted from an action at law to a suit in equity. Betzler & Clark v. James, 227 Mo. 390; Pitts v. Pitts, 301 Mo. 356; Schneider v. Schneider, 224 S. W. 4; Wendover v. Baker, 121 Mo. 289; Koehler v. Rowland, 275 Mo. 591.  (2) The court committed error in refusing to sustain the contention of these appellants that they had been discharged and released of all liability on account of the notes in suit, by operation of a novation substituting Joseph Maxwell as the sole and only debtor in place of these appellants. Pursuant to an agreement entered into between all of the parties to the notes, one of the indorsers, Joseph Maxwell, went to the plaintiff bank and gave his notes to the plaintiff in place of the notes in suit. This was accepted by the plaintiff bank, and acted as a novation and a discharge to these appellants of any liability they had on the notes in suit. 29 Cyc. 1130, 1136; Western Auction & Storage Co. v. Shore, 179 S. W. 771; Appleton v. Kennon, 19 Mo. 637; Riggs v. Goodrich, 74 Mo. 108; Leabo v. Goode, 67 Mo. 126.  (3) The court committed error in not sustaining the contention of these appellants

that the plaintiff was estopped to assert any claim which it might have had against these appellants and to deny that any liability of theirs on account thereof had been discharged and released. The plaintiff bank, by its action in accepting Joseph Maxwell as its sole and only debtor and by its silence led these appellants into a belief that any liability which they might have had on the notes in suit was completely discharged. They, therefore have changed their position and it would be unfair and unjust to now enforce any liability against them. The plaintiff is, therefore, estopped to deny that their liability has been discharged. 8 C. J. 455; Bank v. Lee, 182 Mo. App. 192; Bank v. Lee, 193 Mo. App. 537; Cantrell v. Davidson, 180 Mo. App. 410. (4) The court committed error in refusing to sustain the contention of these appellants that they were discharged and released of all liability on the notes in suit, because the plaintiff granted to Joseph Maxwell an extension of time for the payment of the indebtedness, without notice to or consent of these appellants. By the acceptance of the notes of Joseph Maxwell, together with the payment by him of interest in cash, in advance, the plaintiff bank agreed with him to extend the time of payment of the notes without notice to or consent of these appellants, and such an agreement operated as a discharge of these appellants. (a) Such an agreement, under the statutes and decisions, releases those parties who are secondarily liable and these appellants are secondarily liable. Sec. 906, R. S. 1919; Bank v. Hanlon, 183 Mo. App. 243; Canada v. Shutte, 235 S. W. 824; Walker v. Dunham, 135 Mo. App. 396; Long v. Todd, 226 S. W. 262; Overland Auto Co. v. Winters, 277 Mo. 425; Sunflower State Bank v. Bowman, 243 S. W. 403; Bank v. Koehler, 204 N. Y. 174; Bank v. Bashor, 160 Pac. (Kan.) 208; Bank v. Mutual Exchange, 92 S. E. (Va.) 918; Greenburg v. Ginsburg, 143 N. Y. Supp. 1017.; Deahy v. Choquet, 28 R. I. 338; Motor Co. v. Bank, 226 S. W. (Tex.) 428; Brannon on Neg. Instrument Law, 329-331. (b) There clearly existed such an agreement as is necessary to release these appellants. 8 C. J. 425-429; Bank v. Leavitt, 65 Mo. 562; Russell v. Brown, 21 Mo. App. 51. (c) It is not necessary that such an agreement be made with the maker of the notes. Laumeier v. Hallock, 103 Mo. App. 116; Bank v. Russell, 48 Pac. 242. (5) The court committed error in not finding and holding that any liability which appellants George W. Maxwell and George R. Collett had on account of the notes in suit was discharged by the renegotiation of the notes back to Joseph Maxwell. The notes in suit were renegotiated back to Joseph Maxwell upon their maturity and, therefore, the liability of subsequent indorsers was discharged. Sec. 836, R. S. 1919; Bank v. Evans, 176 Mo. App. 704; Comstock v. Buckley, 124 N. W. (Wis.) 414; Bank v. Gridley, 98 N. Y. Supp. 445; Schwartzman v. Post, 84 N. Y. Supp. 922.

*Thompson & Thompson* for respondent.

(1) Even though this were properly called an equity case the court will defer to the findings of the lower court. Rawlins v. Rawlins, 102 Mo. 567; Nevins v. Moore, 221 Mo. 351; Waddington v. Love, 202 Mo. 416; Taylor v. Cayce, 97 Mo. 249; Bartlett v. Brown, 121 Mo. 364; Judy v. Farmers & Traders Bank, 81 Mo. 410. (2) There was no novation. Night & Day Bank v. Rosenbaum, 191 Mo. App. 559; Chattanooga Bank v. Lovely, 185 Ill. App. 111; Bank v. Butterworth, 45 Barb. 476. (3) There is no estoppel or laches. Mercantile Trust Co. v. Donk, 178 S. W. 113; 8 C. J. 450; Miller v. Mellier, 59 Mo. 388; Schneer v. Lemp, 19 Mo. 40. (4) The taking of the note of Joseph A. Maxwell was not an extension of time to the maker so as to discharge indorsers. Sec. 906, R. S. 1919; Brannon on Neg. Instrument Act, 327, subsec. 6; 32 Cyc. 194; Draper v. Weld, 13 Gray (Mass.) 580; Pingrey on Suretyship, sec. 180; Daniel on Negotiable Instruments, sec. 1324; Wright v. Independence Natl. Bank, 96 Va. 728; First National Bank of York v. Diehl, 218 Pa. St. 588. (5) The giving by Joseph A. Maxwell of his note to the bank did not discharge indorsers subsequent to him, to-wit, Geo. W. Maxwell and defendant Collett. Sec. 907, R. S. 1919; Night & Day Bank v. Rosenbaum, 191 Mo. App. 559.

RAGLAND, P. J.—Plaintiff's suit is on a promissory note. The defendants are the maker and certain indorsers. In their answers they pleaded a number of defenses, and then by cross-bills in which the same matters are set forth they asked the cancellation of the note sued on and that of two others held by plaintiff, alleged to have been executed at the same time and under the same circumstances and with respect to which they sustained the same relations as parties. The avoidance of a multiplicity of suits is the only ground for equitable relief appearing in the cross-bills. Whether the facts pleaded were sufficient to invoke that ground of equitable jurisdiction we need not determine. On the trial of the cause the parties assumed that the cross-bills had converted the action into one in equity and we will so treat it here.

The nature of the questions to be determined requires a somewhat detailed statement of the facts. In 1911 a corporation, known as the Universal Exposition Company (hereinafter called the Company), was organized for the purpose of giving fairs and expositions. It leased land for its purposes from Mr. Joseph Maxwell, constructed a race track, stables, grand-stand and club house thereon, and called it "Maxwellton." In order to complete the improvements just named, which cost approximately $125,000, the Company found it necessary to borrow $12,000. This amount it obtained from the

plaintiff bank on three sixty-day promissory notes, two of the notes being for $5,000 each and the third for $2,000. These notes were given sometime in the year 1912; all were executed by the Company as maker and indorsed by C. F. Blanke, George W. Maxwell, George R. Collett and Joseph A. Murphy. The $2,000 note was also indorsed by S. P. Keyes. All of these indorsers were members of the Company's board of directors. The first and only fair held by the Company was in 1912, and from a financial standpoint it was a complete failure. Thereupon one Wishart was made secretary of the corporation and empowered to liquidate its affairs. His efforts were directed to the getting together of enough funds to pay the debts of the Company without sacrificing its property, with a view to effecting a re-organization and getting in additional capital. He succeeded in paying all the debts except that due the plaintiff bank, but efforts at re-organization which for a time appeared to promise success finally failed.

About the middle of the year, 1914, Joseph Maxwell served on the Company notice of forfeiture of its lease. It immediately surrendered possession of the premises and thereafter ceased to function as a corporation. At the time Maxwell took over the possession, there were in the club house rugs, furniture and furnishings, the value of which according to various estimates was from $100 to $300. But the Company owed him for rent about $30,000, and for taxes which he was compelled to pay $5,000.

The three notes given the plaintiff in 1912 were renewed from time to time by successive renewal notes until December, 1914, the renewal notes in every instance being executed by the Company as maker and indorsed by the same persons who indorsed the originals. Mr. Julius Kessler was president of plaintiff bank; he was also a stockholder, director and treasurer of the Company. In 1914 when the Company for all practical purposes had ceased to exist, he stated to the persons who were indorsers on the Company's notes that if the notes were again renewed they would have to be signed by some other principal and that there would have to be an additional indorser, suggesting in that connection Mr. Joseph Maxwell. Thereafter on December 14, 1914, the last renewal notes given by the Company were surrendered by the plaintiff upon the delivery to it of three notes of that date, two for $5619.37 each and one for $2247.75, all signed by G. C. Hafferkamp as maker and indorsed by C. F. Blanke, George W. Maxwell, George R. Collett, Joseph Murphy and Joseph Maxwell. The $2247.75 note was indorsed by S. P. Keyes also. Hafferkamp, the maker, was a clerk in the office of Blanke, who was also president of the C. F. Blanke Tea & Coffee Company. He signed at Blanke's request without receiving value therefor either directly or indirectly. The notes were not due and pay-

able eight months after date and each contained a provision that ''demand for payment, protest and notice of dishonor are hereby waived by all parties.''

When the Hafferkamp notes were about to mature the plaintiff bank mailed a written and printed notice of that fact to Joseph Maxwell, one of the indorsers. None of the other parties were notified. The notice to Maxwell was on a regular form used by the bank. It stated: ''This bank holds your note,'' etc. On the due date of the notes Joseph Maxwell appeared at the bank and paid the interest which had accrued on them. He then executed to the bank his own notes, to mature in sixty days, for the respective principals of the Hafferkamp notes. Appended to each of his notes was a collateral agreement which he signed. By each such agreement he purported to pledge as security for the note to which it was attached the Hafferkamp notes. Maxwell paid the interest on his notes and renewed them at intervals of sixty or ninety days by giving renewal notes in the same form until 1920, the bank retaining in its possession all the while the Hafferkamp notes. In 1921, a bank examiner directed that the Maxwell notes to which the Hafferkamp notes were attached as collateral be either collected or charged off. Thereupon the bank demanded payment of all parties to the Hafferkamp notes. Such payment not being made this suit was commenced on one of the notes.

As it is claimed that Joseph Maxwell at the time of the giving of the Hafferkamp notes assumed the entire indebtedness represented by them, some further statement as to the evidence having a bearing on that transaction is necessary. Wishart on behalf of defendants testified: ''After the company had closed its office and given up the business, in order to take care of the indebtedness which was owing to the bank and anticipating a renewal, I visited Mr. Joseph A. Maxwell a couple of weeks before the Hafferkamp notes were executed, about the first of December, 1914, at Mr. Maxwell's office at East Saint Louis, or National Stock Yards. I spent most of the afternoon with Mr. Maxwell going over the situation and I told Mr. Maxwell that he could see what was coming. . . . I said to him, 'Mr. Maxwell, something must be done to clear up this situation. These notes have to be renewed and I will have to arrange with the bank about it. It seems to me, you ought to take care of these notes, if there is any beneficiary.' . . . 'If there is any beneficiary from this money which was raised from the bank, you are the one, not these indorsers, as it went into improvements on your property which you have now full possession of, and these gentlemen have no interest in it at all.' And Mr. Maxwell said to me 'Well, if you can make arrangements with the bank for the renewal of the notes and make the time eight months instead of what we

have been having, ninety days, why I will take the notes up at maturity and release these men from their liability.' . . . The following day I went to Mr. Kessler's bank in Wellston and said, 'Mr. Kessler, now about these renewal notes of the Universal Exposition Company inasmuch as we have ceased to function there is no more Universal Exposition Company and I have been to Mr. Maxwell and Mr. Maxwell tells me if we can succeed in getting renewals for eight months, that he would assume the payment of the notes at maturity. What do you think about it, Mr. Kessler?' and Mr. Kessler said, 'That is alright, we will extend the notes and we will make the notes eight months, that will be all right, but I cannot accept the renewal with the principal being the Universal Company . . . You will have to arrange for someone else to become principal.' Well, I said that we will try to fix that all right and I left him with that understanding." He further testified that it was pursuant to such understanding on the part of all parties that the Hafferkamp notes were executed.

Mr. Joseph Maxwell was also called as a witness by defendants. He testified: "I had a great many conversations with Mr. Wishart on different things and just before I indorsed this note or these notes . . . . He said that Mr. Kessler wanted me to indorse these notes and insisted that I indorse these notes. He said that Mr. Blanke did not want to be a signer on the note any more. That is what he told me, he wanted to put a straw man on it. He did not say Mr. Hafferkamp. I have never heard of Mr. Hafferkamp in this matter until one and one-half years ago. I indorsed the notes at that time and that is the way I became an indorser. I did not tell Mr. Wishart that I would become solely responsible for the payment of these notes and when they came due I would take them up. Mr. Wishart came to me and told me that Mr. Kessler wanted me to indorse the notes. I did not tell Mr. Wishart to go to Mr. Kessler and tell Mr. Kessler to make the time on the new notes for eight months; Mr. Wishart came to me and asked me to have them indorsed. I then indorsed these notes and gave them back to Mr. Wishart and he took them away. . . . When the Hafferkamp notes became due, I got notice from the bank and went in. I have known Mr. Kessler, the president of the bank, for a long while. I never done any business with the bank, but I had known him a long while. I sold him mules. He knew me and my standing, and who I was and all about me. I did not read the notes. I went in and told him that I would pay the interest on it . . . I went in there and Mr. Kessler said the notes are due, the stockholders' notes or directors' notes are due, that is what he said . . . and I said, 'I will pay the interest,' and I did, and I gave my collateral note for the Hafferkamp notes. . . . Mr. Kessler had the Hafferkamp

notes there at that time, but I did not read them. I was an indorser on the Hafferkamp notes and responsible on them. That is what I gave the interest for. Mr. Kessler had the Hafferkamp notes there on his desk. I don't think I ever put my hands on them. I never had my hands on them except when I signed them. I never had them in my possession at all. I signed the notes at that time, but I never had them or read them after that. The bank retained them all the time as far as I know. I never had them in my hands after I signed them. At the time the Hafferkamp notes came due in August of 1915, I gave my personal notes to the State Bank of Wellston because I did not want to have a lawsuit. I did not want Mrs. Maxwell to find out that I was an indorser. I promised her I would never put up a cent. I signed the note for to keep them from suing me and I knew if I were sued that it would be talked about and my wife would know about it and I would have to pay it or George would have to pay it. We were indorsers. I did not want to be sued and did not want the stockholders sued. I mean the indorsers. I was an indorser and so was my son. I did not want a lawsuit brought against me and these indorsers because my wife would know about it. So that is the reason I made arrangements at the bank. Now there being . . . they are trying to move the fair on and I thought sometime if they did that if they would take hold of it somebody would pay so the directors or stockholders would pay. I mean the indorsers would pay it. That is the reason I let it run along the way I did.''

Mr. Kessler testifying for plaintiff said: ''About the first of December, 1914, Mr. Wishart did not come out to my bank and tell me that he had seen Mr. J. A. Maxwell and that Mr. Maxwell had said to him that if he, Mr. Wishart, would go to me and get me to extend these notes for eight months when they became due, he would take them up and pay them. I never saw him. He did not come to my bank at or about the time the last Universal Exposition Company notes were falling due and at the time the Hafferkamp notes were given and tell me that. . . . After the Hafferkamp notes had been given to the bank they were coming due in August of 1915. Mr. Joseph A. Maxwell was an indorser on these notes. I had known him forty years and knew all about him. When these notes came due, the Universal Exposition Company was out of existence and they did not have any office. Mr. Collett was in Kansas City. Mr. George Maxwell was in St. Louis if I am not mistaken, I am not sure now but I think he was. The only acquaintance I had with Mr. Blanke was with the Universal Exposition Company. I did not know Mr. Blanke before at all. I never saw Mr. Hafferkamp at all. The man I knew was Mr. Maxwell. I sent the notice that these Hafferkamp notes were coming due to Mr. Joseph

Maxwell.   Prior to that time the Universal Exposition Company had an office and I sent the notice of these notes to that office.   When I sent the notice to Mr. Maxwell he came in   .   .   .   I am now referring to the Hafferkamp notes that came due in August, 1915. At that time he said, 'Well, I got the notice and   .   .   .'   I said, 'Do you want to pay these notes?' and he said, 'No, I came in to pay the interest on the one that is maturing, but I am willing to give you a collateral note to secure the other note.'   I told him that was all right.   I had the Hafferkamp notes there, but did not give them to Mr. Maxwell.   I put them back in the vault and have always kept them.   They have never been out of our possession.   Mr. Maxwell signed a new note and gave me money for the interest and money for the internal revenue stamps for the new note.   Sometimes we made the Maxwell note for sixty days and sometimes for ninety days and sometimes for six months.   These three Hafferkamp notes fell due a few days apart.   The arrangement on all three of the notes was the same.   The same procedure that took place in August, 1915, always took place.   That is, when the personal notes of Mr. Maxwell came due the same procedure took place; he paid the interest on them again and gave his collateral note again and we always held the same collateral.   We always kept the Hafferkamp notes.   .   .   . We are still holding these notes, we have always taken collateral notes from Mr. Maxwell until matured.   We don't handle any past due paper, when the note matured Mr. Maxwell comes in and pays the interest for it and we hold the same collateral.   We handle no past due paper.''

No demand of any kind was ever made on the parties to the Hafferkamp notes, other than Joseph Maxwell, until shortly before the institution of this suit.   They never made any inquiry with reference to the notes, and no information of any kind was ever given them by either the bank or Joseph Maxwell.   Keyes, who was an indorser on the smaller one of the notes, died in 1920 leaving a solvent estate.   During the time his estate was in the course of administration the bank knew of the fact, but presented no demand against it.   The time within which claims could be presented had expired when demand was made upon the defendants in this case.

The note sued on in this case was one of the larger ones.   The maker and all of the indorsers were made parties defendant.   Service was not had on Joseph Murphy and the cause was dismissed as to him.   Joseph Maxwell did not answer or plead, but suffered judgment of default.   The remaining defendants by their pleadings asserted the following defenses:   (1) That the taking of the Joseph Maxwell notes by the plaintiff at the time the Hafferkamp notes matured constituted a novation; (2) that the taking of the Joseph Maxwell notes at the maturity of the Hafferkamp notes and the

acceptance of interest thereon in advance by plaintiff bank without the knowledge or consent of the other parties to the Hafferkamp notes, operated to discharge them from further liability; (3) that plaintiff, knowing that the Hafferkamp notes were signed by all parties thereto upon the distinct understanding that at maturity they were to be paid or taken up by Joseph Maxwell, by its course of conduct led the other parties to said notes to believe that they had been paid in accordance with such understanding, and for that reason plaintiff is now estopped to assert liability against any except Joseph Maxwell; and (4) that the execution of the collateral notes by Joseph Maxwell and their acceptance by plaintiff constituted a re-negotiation of the Hafferkamp notes by Maxwell, whereby all indorsers on those notes whose names appeared thereon after Maxwell's were released from further liability.

The trial court found all issues for the plaintiff. It accordingly gave plaintiff judgment for the amount of the note sued on and dismissed defendants' cross-bills. From such judgment the defendants Collett, Blanke, Hafferkamp and George Maxwell prosecute this appeal.

Matters of evidence not covered by the foregoing statement will be referred to in the course of the opinion.

I. With reference to the parties to the Hafferkamp notes it is contended by appellants that Joseph Maxwell was the principal

**Novation.**    debtor and the others his sureties, and that this fact was at all times known to the plaintiff. A determination of whether that was the relation which the parties respectively sustained to each other will aid in solving some of the questions raised and entirely dispose of others. The only direct evidence offered in support of the contention that the debt evidenced by the Hafferkamp notes was that of Joseph Maxwell, and his only, was the testimony of the witness, Wishart, and that was flatly contradicted by both Maxwell and Kessler, president of plaintiff bank. The testimony of these three witnesses has heretofore been set out at length and need not be repeated. Putting it aside and taking into consideration certain outstanding facts which are either conceded or conclusively established, it seems wholly improbable that Maxwell took upon himself the entire burden of the Company's debt to the bank. In the first place there was no consideration for his assumption of such an obligation. It was alleged in the answers and cross-bills that in winding up the affairs of the corporation, and as a part of the agreed plan of liquidation, the Company surrendered to Maxwell its lease and the possession of the demised premises and turned over to him certain personal property, in consideration of his assumption

of the Company's indebtedness to the bank. But this allegation was wholly unproved. The evidence conclusively shows that six months or more prior to the giving of the Hafferkamp notes Maxwell had served notice on the Company that he elected to forfeit the lease for the non-payment of rent and taxes and that thereafter the Company unconditionally surrendered to him the possession of the premises. It left in the club house some furniture and furnishings of small value without explanation of any kind. Maxwell assumed that it was meant for him to get whatever he could out of these on account of what was due him for rent and taxes. In so far as the race track, grand-stand, etc., were concerned they added nothing whatever to the value of the land, the available uses to which it could be put considered.

Another significant fact is that Maxwell did not sign the notes in question as maker. The corporation was defunct and there was no longer a responsible principal to execute the renewal notes. A "straw-man" therefore had to be found, and Hafferkamp was induced to serve. If Maxwell had assumed the indebtedness and agreed to pay it at maturity, the natural and usual thing for him to have done under those circumstances would have been to sign the notes as maker.

Up to the time of the giving of the Hafferkamp notes Maxwell had never assumed any responsibility for the company's obligations. He was under no legal duty to do so then. The corporate venture, however, had resulted in a clear net loss of $12,000 and some accrued interest which would fall upon those who were so unfortunate as to be left with the bag to hold. Maxwell was not one of those, but his son was. There was still a lingering hope that other persons of means could be interested in what was deemed a civic enterprise, that of giving fairs and expositions which would attract visitors to the city of St. Louis, and in that event the grounds of Maxwell and the costly improvements upon them could be put to a use which would retrieve the losses suffered by the Company and make it possible to save harmless the stockholders who had pledged their credit in its behalf. Maxwell, however, was willing to share in the loss if ultimately it could not be averted. For that reason he signed the notes in controversy as a co-obligor with the other indorsers. That in effect is the explanation given by him for indorsing the notes and it seems to be a reasonable one.

The directors of the Company who had indorsed its notes were accommodation indorsers. But when the last renewals of those notes matured the Company was not only insolvent, but had ceased to function. In view of that fact the indorsers recognized that their obligations had become absolute, that the debt was then theirs. There was no suggestion on the part of any of them that their liabilities

with respect to each other were governed by the order in which their names appeared on the paper. They acted upon the tacit assumption that their obligations were equal and mutual; in other words, that they were co-sureties. They took counsel among themselves for the purpose of getting an extension of time on their indebtedness. Thereafter they caused new notes to be signed by a "straw-man" as maker, and again assumed for themselves the role of indorsers. Maxwell in joining them as an indorser, under the circumstances heretofore narrated, became a co-obligor. Hafferkamp concededly was an accommodation maker. The indorsers therefore were the principal debtors and Hafferkamp a surety.

II. The taking of the Maxwell notes did not operate to discharge the Hafferkamp notes, unless the former were given and accepted **Discharge:** as absolute payment of the latter. The question is purely **Intention.** one of intention. [Appleton v. Kennon, 19 Mo. 637.]
        If it may be resolved upon the testimony of the parties between whom the transaction was had, the solution is easy. Each explicitly denied that he intended, the one in giving the new notes and the other in accepting them, that they should constitute payment of the old, or that thereby the liability of any of the parties to the old should be discharged. And if on the other hand the circumstances attending the transaction be looked to, the question of intention is but little more difficult of determination. The fact of foremost importance is that the bank never surrendered the Hafferkamp notes, but retained them in its possession and at all times treated them as live and subsisting obligations. It is true that in so far as the bank's records were concerned they changed from main to collateral obligations upon the giving of the Maxwell notes, but it does not require any great discernment to see that the change was as to form only. When the Hafferkamp notes matured they had to be paid or renewed. The bank could not carry past due paper. That rule, however, did not apply to paper held as collateral. The parties to the notes were scattered, only Joseph Maxwell was at hand. As a matter of convenience his notes were taken in renewal of the Hafferkamp notes and they carried as collateral to his. This was in reality but a method of extending the time of payment of the Hafferkamp notes.

On the theory of payment the most that can be said is that the bank accepted Maxwell's notes as conditional payment. The condition implied was that the new notes be paid at their maturity. If that had been done there can be no question but that the original indebtedness would have been satisfied. But the condition was not performed. [Bank v. Leavitt, 65 Mo. 562.]

III. It is claimed that the taking of the Maxwell notes and their successive renewals, and the acceptance of interest in advance, con-

stituted binding agreements on the part of plaintiff with Maxwell, whereby he was successively granted extensions of time for the payment of the Hafferkamp notes, and that by reason thereof the other parties to those notes were released from further liability.    So far as the other indorsers are concerned the principle invoked is wholly without application.    Such agreements did not have any greater legal effect than if they had been covenants not to sue Maxwell for a specified time.  [Shed v. Pierce, 17 Mass. 628.]    Any one or more of his co-obligors could, notwithstanding, have paid the notes at any time and then sued him for contribution.  [Wright v. Bank, 96 Va. 728; First National Bank of York v. Diehl, 218 Pa. St. 588.] As to Hafferkamp: It is true that with respect to the other parties to the notes he was a surety; but that fact, so far as the evidence discloses, was not known to the bank.  On the face of the several instruments he was the maker, the one who was primarily liable to the holder, the one who by their terms was absolutely required to pay them.  [Sec. 981, R. S. 1919.]  For the reasons indicated the extensions of time given Maxwell afforded none of the appellants a ground of defense.

IV. All parties to the notes in controversy at the time they signed them waived demand of payment, protest and notice of dishonor. At the maturity of the notes their liability became fixed without further steps of any kind being taken.    There was there-
**Demand.**      after no duty resting upon the bank to demand payment of the notes, or the payment of interest, or to give notice to the parties or any of them that their obligations were outstanding and unsatisfied.    It was under no duty to sue them, or any of them; its indulgence and forbearance did not operate to release any of them from liability.   [Clark v. Barrett, 19 Mo. 40; 8 C. J. 450.]

Appellants, however, found their claim of estoppel on their assertion that Maxwell at the time of the execution of the notes promised his co-indorsers that he would pay the notes at maturity and release them from all further responsibility.    That Maxwell made any such promise or that any information to that effect was ever
**Estoppel.**      communicated to the bank was not established by the greater weight of the evidence, as we have heretofore endeavored to show. But if it be assumed that Maxwell had promised his co-obligors that he would pay the notes, which represented their joint indebtedness, and the bank knew it, still it was not incumbent upon the bank to notify Maxwell's promises that he had failed to perform.    That was a matter that concerned them alone and with respect to which no duty devolved upon the bank.    There is no estoppel in the case.

V. It is contended by appellants that at the maturity of the Hafferkamp notes they were negotiated back to Joseph Maxwell and

that thereupon those indorsers whose names followed his on the paper (alleged subsequent indorsers) were discharged. Section 836, Revised Statutes 1919, is cited in support of the contention. It seems

**Collateral Security.**
obvious that the rule of law of which the section is declaratory is wholly inapplicable to any hypothesis of fact which may reasonably be based on the evidence. The instruments could not have been "negotiated back" to Maxwell for the simple reason that he had never been a holder prior to the time of the alleged "negotiation back;" there were no "intervening" parties, because all of the indorsers were in effect joint indorsers as has already been pointed out. The only question of importance suggested in connection with this insistence of appellants' is whether the notes in controversy were *ever negotiated* to Maxwell. The notes given by Maxwell upon the maturity of the Hafferkamp notes had each attached to it a printed form of collateral agreement. As filled out each recited: "We hereby pledge to said State Bank of Wellston or its assigns as collateral security of said note or for said other liabilities three notes aggregating $14,115.88 signed by G. C. Hafferkamp, and indorsed by C. F. Blanke, Joseph A. Murphy, George R. Collett and George W. Maxwell and Joseph A. Maxwell." It is claimed that this recital shows that the Hafferkamp notes were taken up by Maxwell and re-issued by him in the form of a pledge to secure his own. While it is possible to so construe the transaction (Bank v. Evans, 176 Mo. App. 704), such a construction is not a necessary one. The evidence convincingly shows that it was not intended by either of the parties to the transaction that the Hafferkamp notes should be discharged as by payment or that the ownership of them should be transferred to Maxwell, but merely that they should be subordinated to the position of collateral paper so that the debt for which they had been given could be carried conformably to banking rules. We know of no rule of law which forbids giving effect to that intention.

In view of the foregoing the judgment of the circuit court was for the right party. It is therefore affirmed. All concur, except *Graves, J.*, absent.