JOHN AVEN AND BERT ELLIS, Appellants, v. J. FRED ELLIS.—66 S. W. (2d) 828.

Division Two, December 20, 1933.

*Jones, Hocker, Sullivan & Gladney, Sid C. Roach* and *Ralph T. Finley* for appellants.

*Stephen C. Rogers, Owen G. Jackson, Farrington & Curtis, Chas. M. Farrington* and *Paul W. Barrett* for respondent.

FITZSIMMONS, C.—This is an appeal from a judgment of the Circuit Court of St. Louis County in favor of defendant J. Fred Ellis in an action upon a promissory note of which defendant was indorser. The note was for the principal sum of $14,750. The note was dated at Springfield, Missouri, June 18, 1920. It was payable in 120 days from date. C. W. Rogers was the maker. The American Savings Bank of Springfield and defendant J. Fred Ellis were the payees. Defendant Ellis indorsed the note for the accommodation of the maker Rogers, before the latter delivered it to the bank and received payment of the named consideration. Plaintiffs as the legal holders and owners of the note by assignment of the American Savings Bank sued defendant indorser for the balance claimed to be due, namely $10,604.50.

The defendant, by answer, admitted that he signed and indorsed the note and its predecessor. He pleaded in discharge of his liability that his signature was procured by fraud and misrepresentation; that the time of payment of the note was extended without defendant's knowledge or consent; that either the time of payment of the note sued on was further extended or it was paid by the acceptance by the American Savings Bank from Rogers of two notes, one for $10,000 and one for $4,750; that the note was paid by the maker, C. W. Rogers; that usury was charged upon the note, of all of which

plaintiffs, as president and cashier respectively of the American Savings Bank had knowledge and to the doing of all which they were parties. Plaintiffs assign as errors the refusal of the trial court to give a requested instruction in the nature of a directed verdict for plaintiffs, none of the defenses having been made out by defendant; the refusal to give five requested instructions withdrawing from the consideration of the jury the issues of fraudulent procurement of defendant's signature, payment and extensions of time of payment. They also charge error in the giving on behalf of defendant of instructions submitting these issues, for the like reason namely, absence of substantial evidence. The trial court gave an instruction withdrawing the issue of usury. It thus appears that the question for our decision is whether there was substantial evidence offered in support of the submitted defenses to sustain the verdict of the jury in favor of defendant.

I. Defendant's answer and the undisputed evidence shows that the note sued on, dated June 18, 1920, was a renewal of a note for a like amount, namely $14,750, dated December 18, 1919, executed by C. W. Rogers, payable six months after date to the order of defendant, J. Fred Ellis, indorsed by him and then discounted by Rogers with the American Savings Bank. It is not disputed that, at and before December 18, 1919, and thereafter until the State Finance Department closed the bank in November, 1923, plaintiff, John Aven, was president and plaintiff Bert Ellis, was cashier of the bank. It is also conceded that, at the times of the indorsement of the mentioned notes, defendant J. Fred Ellis was in the life insurance business; that he lived at Mountain Grove near Springfield, Missouri; that he frequently visited Springfield and that he did business with the American Savings Bank. Defendant Ellis knew the plaintiffs for a long time, the plaintiff Bert Ellis for thirty-five years. Plaintiff Ellis was best man at the wedding of defendant Ellis. They were not related.

On December 18, 1919, the date of the execution of the first note, both plaintiffs and defendant testified, defendant Ellis entered the bank and found plaintiffs there in the company of C. W. Rogers whom defendant had not met before. Defendant Ellis visited the bank that day in response to a suggestion of plaintiff Ellis. When defendant Ellis entered the bank, he testified, plaintiffs introduced him to Rogers and then they took him to the directors' room and urged him to indorse Rogers' note for $14,750. Defendant testified concerning this conference with plaintiffs in the directors' room; "First one talked then the other, about this man sitting out in front: 'This man sitting out in front is worth over $300,000; owns two

banks, one in Picher, Oklahoma, one in Perrin, Texas. Now, this is a deal that you might be interested in. It is a deal that you can't go back home and talk about to "Ade." ' That is my wife. 'Ada' is her name, but that is what we call her. They told me about his Buffalo, Missouri, holdings. They told me that he owned a lot of property in Buffalo, Missouri. (Colloquy omitted.)

"Q. What did Mr. Aven say now to you? A. This man owns property at Buffalo, Missouri. That is in Dallas County. He owns the two banks. He owns property in Baxter Springs, Kansas, that they knew about, that the rent income was over $700 a month. They knew, he said, over $300,000 was his worth. They had made him a prior loan there in the bank, but his balance now due on it was only $4,000. However, they had $24,000 of security for that four. This $24,000 of security consisted of notes and deeds of trust that they had investigated in and around Buffalo, Missouri, that they knew were good. Now, the man wants some more money. He wants to borrow $14,750. And that, added to the four made a loan too big for the bank. This $14,750 would be too big a note for the bank unless it was done in a three-cornered way; and they wanted to make me that note, me sign it on the back and appear, as it does appear, the indorser. Now, that is how I came to sign the note."

These representations are substantially the same as the allegations in the answer charged to have been made, to have been false, to have been known to plaintiffs to be false, and to have been relied upon by defendant, at the times of the indorsement of both notes. Defendant Ellis also testified that, at this conference, plaintiff Aven, president of the American Savings Bank, said to defendant: " 'This man is this kind of banker: Of course, he could borrow this money out of his own bank, but he is the kind of banker that won't borrow money out of his own bank.' He didn't tell me at that time that Rogers was connected with a bank that had been closed. He didn't tell me what he was getting this money for. He needed the money and wouldn't borrow it out of his own bank because he was the kind of banker that didn't want his own paper in his own bank. I didn't know at the time that Rogers had a closed bank at Picher, Oklahoma. I didn't know that the collateral they told me they had $24,000 worth of collateral, was borrowed in order that he might open a closed bank. Mr. Ellis was present at the time Mr. Aven was talking."

Both plaintiffs (Bert Ellis in his testimony in chief) testified that, at the time of Rogers' presence in Springfield on December 18, 1919, Rogers was heavily interested in a National Bank at Picher, Oklahoma, which bank had been closed. Rogers had made a previous visit to Springfield to procure funds necessary to open his national bank. On that occasion, upon the testimony of plaintiffs and of Rogers, the plaintiffs and Rogers went to Kansas City, where the plaintiffs

aided Rogers in borrowing $20,000. For this service the plaintiffs had charged Rogers $5,000. When Rogers returned to Springfield, Missouri, December 18, 1919, it was for the purpose of procuring $11,000 additional funds, the money which had been obtained in Kansas City not having been a sufficient addition to the assets to cause the national bank examiner to authorize the reopening of the closed bank at Picher. Before defendant J. Fred Ellis arrived in the bank on the morning of December 18, 1919, or had any knowledge of Rogers or of his mission, the plaintiffs, by the testimony of plaintiff Bert Ellis, had talked to Rogers about what they personally would charge him for causing the bank of which they were the chief officers to lend him $11,000. They did in fact charge him $3,750, being the difference between the principal of the note, $14,750 and $11,000, the amount given to Rogers. And this commission charge, Rogers testified, he and plaintiffs agreed upon before defendant was mentioned in the transaction. While the issue of usury arising out of the commission of $3,750, charged and paid, was withdrawn by the court, that transaction, admitted by plaintiffs, was testimony going to the proof of fraud in the procurement of defendant's indorsement of the note. It is true that plaintiffs testified that they paid to defendant about ten days after the indorsement of the first note, $1,000 as defendant's share of the commission; that defendant bargained with Rogers for this commission, and also concerning the collateral which Rogers was to pledge; that defendant had full knowledge of the closed bank at Picher, Oklahoma; that plaintiffs did not confer with defendant about his indorsement of the note, and that they did not make the representations charged. But the contrary testimony of defendant on all these points and of Rogers on some of them which were within his knowledge, presented issues of fact for the determination by the jury.

Without further narrative of the evidence on this point, we state that, in our opinion, defendant upon the case made, was entitled to have submitted to the jury the issue of fraud. A tendency of the courts, pertinent to this assignment and to the two next succeeding ones, is stated in 26 Corpus Juris, 1144, and quoted with approval in Monsanto Chemical Works v. American Zinc, Lead & S. Co. (Mo.), 253 S. W. 1006, l. c. 1009: "The tendency of modern decisions is not to extend but to restrict the rule requiring diligence, and similar rules, such as *caveat emptor* and the rule granting immunity for dealer's talk, and to condemn the falsehood of the fraud feasor rather than the credulity of his victim."

II. Plaintiffs complain that the failure of defendant Ellis to repudiate his agreement to endorse Rogers' note upon discovery of

Rogers' financial condition and his failure to return the consideration of $1,000 bars his defense of fraud.

This assignment disregards defendant's testimony that he did not receive $1,000 in payment for his indorsement of the note. It ignores the testimony of Rogers that he did not agree to pay defendant $1,000 as plaintiffs allege, to become his indorser. Surely defendant should not be held to the duty to repay $1,000 upon plaintiffs' controverted testimony that he received that sum for indorsing the note. But, if we assume as true plaintiffs' testimony that defendant agreed with Rogers to indorse the note in consideration of $1,000, that was an independent agreement separate from the contract with the bank evidenced by the note in suit. And Rogers, not plaintiffs, by their own evidence, paid the money out of the loan of $14,750 made by the bank. In the circumstances defendant may set up against the plaintiffs fraud practiced by them in discharge of his liability to them as holders of the note, without refunding the one thousand dollars. [Pioneer Stock Powder Co. v. Goodman, 201 S. W. 576.] Any right to a refund, which might exist, was personal to Rogers and was of no avail to plaintiffs. Defendant's agreement to indorse was almost simultaneous with his actual indorsement of the note. This is not an action in equity in which defendant sought affirmative relief. His defense of fraud was not lost to him merely because he did not assert it until plaintiffs, as assignees of the American Savings Bank, sued him upon the note. Upon the only occasion that appellants gave sign to defendant that they looked to him upon his indorsement, namely when plaintiff Fred Ellis wrote a letter to defendant in December, 1924, defendant in effect disavowed liability. For these considerations we rule against plaintiffs their objection that defendant did not repudiate his agreement to indorse the note and that he did not refund $1,000 which plaintiffs allege was a consideration for defendants' signature of the note.

III. Neither do we see merit in the assignment that the representations concerning which defendant testified were merely expressions of opinion and therefore not fraudulent misstatements of fact. Expressions as to values of property and as to the financial worth of persons sometimes may be opinions and again they may be statements of fact. We are of opinion that in this case the statements were of facts under the rule stated in Finke v. Boyer, 331 Mo. 1242, 56 S. W. (2d) l. c. 375, and cases and authorities there cited. It is safe to say that bankers, of all men, make it their business to have factual knowledge of the worth of those who borrow from them and of the value of property that enters into their computation of the financial standing of those with whom they deal. It is also true that to bankers in an especial sense is attributable the rule stated by

Pomeroy (2 Pom. Eq. Juris. (35 Ed.), sec. 878, and quoted in Stonemets v. Head, 248 Mo. 243, 154 S. W. 108, l. c. 114) : " 'There is still another and perhaps more common form of such misrepresentation. Wherever a party states a matter, which might otherwise be only an opinion, and does not state it as the mere expression of his own opinion, but affirms it as an existing fact material to the transaction, so that the other party may reasonably treat it as a fact, and rely and act upon it as such, then the statement clearly becomes an affirmation of fact within the meaning of the general rule, and may be fraudulent misrepresentation. The statements which most frequently come with this branch of the rule are those concerning value.' "

IV. The first extension of payment of the note sued upon is alleged to have been made on February 7, 1921, for the period ending February 18, 1921. If it was indeed an extension it is not disputed that defendant did not agree to it. And the law is settled that; in such circumstances, he was no longer liable. The major facts in evidence are that the note sued upon bears this indorsement: "Interest indorsement, February 7, 1921, $1,418.82 to February 18, 1921." The note was dated June 18, 1920. Plaintiff Bert Ellis on the witness stand calculated the interest at 8% per annum from date to February 18, 1921, a period of eight months, to be $786.64. Obviously; therefore, a payment of $1,418.82, if applied wholly to interest would cover the interest from the date of the note, June 18, 1920, to August 30, 1921, a period of one year and seventy-three days. But Bert Ellis testified it was his understanding with Rogers, at the time of the payment of $1,418.82 on February 7, 1921, that $750 was to be applied to principal, and the balance $686.82, to interest for a little over seven months. Plaintiff Ellis also stated that he gave oral instructions to that effect to the note teller through the assistant cashier. However, the ledger sheet reflected the payment of $1,418.82 as a credit wholly to interest. The note, sued upon and offered in evidence by plaintiffs, showed the like application of the credit. The petition did not recite an application to principal of any part of the payment of $1,418.72. Plaintiffs' given instruction on the measure of debt reflects the application of the whole sum of $1,418.82 to interest.

A further fact, bearing on the question of extension is that the note in suit, dated June 18, 1920, and offered in evidence, bore the words originally: "Due October 18, 1920." These words were delineated and after them were written the words: "Due February 18, 1921." Plaintiff Bert Ellis, cashier of the American Savings Bank, at the time of these transactions, and, by his testimony, a frequent scrutinizer of notes due the bank, read these notations of due dates into the

record. He contented himself with the statement that he did not make the erasure and change, and that he did not know the author.

A last fact on this phase of the case is that Rogers, the maker of the note and the payer to the American Savings Bank of $1,418.82 on February 7, 1921, testified as follows concerning a conversation with Cashier Ellis at the time of the payment: "Q. Did you have any conversation with Bert Ellis at that time about extending the note? A. Yes, we did. They were crowding on the note a little bit; that is, they were being crowded a little at the bank, the way they explained it to me, and they wanted to keep the note a future-due note instead of past-due. It seemed as though the bank examiner was howling on past-due notes and they wanted future-due paper.

"Q. Detail all the conversations that you had there with Bert Ellis with reference to this interest payment? A. That is about all there is to it. He just was extending the note up for—

"MR. FINLEY: Now, I object to that as a conclusion.

"THE COURT: That may be stricken out. What did he say? That is proper testimony. What did he say? A. He just said by making that payment we would get the note in shape and it would be a future-due note, instead of a past-due note, to carry in his case."

Upon this evidence we do not hesitate to rule that the trial court correctly decided to submit to the jury the question whether the transactions of February 7, 1921, operated to postpone the date of payment.

We are quite ready to follow the decisions of this court, cited by plaintiffs, holding that a promise of extension upon a note, in order to discharge a surety thereon, must be such as will prevent the holder from bringing an action against the principal; and the taking of interest in advance will not constitute such a promise. [Hosea v. Rowley, 57 Mo. 357; Coster v. Mesner, 58 Mo. 549; St. Joseph Fire & Marine Insurance Co. v. Hauck, 71 Mo. 465.] But the facts here go beyond the facts in those cases, and are sufficient to authorize a submission to the jury of the issue of extension upon the authority of those cited cases.

V. A further defense which defendant pleaded in discharge of his liability as an indorser and which the court submitted to the jury was based on the fact that American Savings Bank, without the knowledge or consent of defendant accepted two notes dated June 16, 1922, for the principal sums of $10,000 and $4,750, respectively, payable on demand to its order and executed by C. W. Rogers as maker, and that the bank also accepted two like notes dated June 9, 1923, in renewal of the first two notes. The sum of each pair of these notes equals the principal of the note sued on, namely, $14,750. Defendant

pleads that the American Savings Bank received and accepted these two notes either in payment of or in extension of the time of payment of the indorsed note. While the smaller of the two notes is not fully exhibited in the abstract of the record, all witnesses agree that certain collateral which secured the indorsed note, namely a diamond and what is called the Martin note for $7,000, became the collateral of the smaller note for $4,750. Plaintiffs contend that these two smaller notes were collateral of the indorsed note, that there is no evidence that the bank took them in payment or extension of the indorsed note, and therefore that these smaller notes did not discharge defendant from his liability.

The only testimony of C. W. Rogers concerning the making of the two notes was as follows: "Q. Now, later, state to the jury whether or not you executed two new notes, one for $10,000 and one for $4,750 on account of this transaction. A. I did." Plaintiff Bert Ellis testified that the $14,750 loan was excessive in the American Savings Bank. "In other words, under the law we couldn't loan one individual that amount of money; so we sought some convenient way of carrying it to try to avoid criticism from the State Banking Department; and we had Mr. Rogers loan—to execute collateral notes; one of $10,000, and one of $4,750, that we might carry it in some way that would avoid criticism." His further testimony emphasized and enlarged the contention of plaintiffs that these two notes were collateral to the note sued upon.

Plaintiffs, in support of their contention that the two notes for $10,000 and $4,750 did not discharge the note for $14,750, urge as an applicable Missouri rule that, in order to make a renewal note effective as payment of the original note there must be present a special agreement to that effect. [Citizens Bank of New Franklin v. Gaines, 278 S. W. 784.] This court stated the doctrine in the old case of Appleton v. Kennon, 19 Mo. 637, 641, in the words: "The accepted note or bill must, by the agreement of the parties, be taken expressly as payment, otherwise it is but payment *sub modo;* it is not an extinguishment or satisfaction of the debt until the note be paid; then it becomes a full payment and discharge. The parties must *intend* at the time, that the receipt of the note of such third person shall be a payment, shall extinguish the debt, or it will be a conditional payment; that is, a payment when the note is paid."

Under the undisputed evidence, the American Savings Bank received the proceeds of the two smaller notes, whether they were collateral to or in discharge of the note in suit. On January 31, 1923, the American Savings Bank acting through plaintiffs who then were its president and cashier respectively sold to the Farmers' Bank of Fairplay for $20,000, five notes aggregating $19,315. One of these was

the Rogers note for $10,000. The Savings Bank received the purchase price. If the two Rogers notes were collateral, the sale of the $10,000 note was under the power of sale contained in the contract of pledge appended to the note in suit. Any other sale of collateral would be conversion. [The Southworth Company v. Lamb, 82 Mo. 242; Tennant v. Union Central Life Insurance Co., 133 Mo. App. 345, 122 S. W. 755, 1. c. 759.] The amount derived from the sale of the $10,000 note as collateral was, *pro tanto*, a payment of the note in suit. But that payment was not credited—a circumstance which, with others to be noted is evidence of that intent of payment of the original note mentioned in Appleton v. Kenyon. If the $10,000 note was not sold as collateral but as the absolute property of the American Savings Bank in which Rogers as pledgor had no right of property, the sale was evidence of the payment of the note in suit. The evidence indicates that the bank received $10,000 from the sale of this note.

After the American Exchange Bank closed in November, 1923, and plaintiffs ceased to be its officers, the new management permitted plaintiffs to sell to another bank the $4,750 note together with other notes in order to obtain $28,000 to be used in the reorganization of the closed bank. The collateral upon the principal note, namely the Martin note and the diamond, went as collateral with the $4,750 note. The bank to which the latter note was transferred in time foreclosed the collateral of the $4,750 note and applied the proceeds to the payment of the note for $4,750, reducing the amount due on that note to $76. We cannot determine precisely from the record what sum the closed American Savings Bank received for the $4,750 note as it was part of an unspecified batch for which a total of $28,000 was obtained. But the reduction of the amount due on it to $76, by the sale by the purchasing bank of its collateral gives a measure of the value which the savings bank received. If the sold note was collateral, it, like the note for $10,000 could have been sold by the bank only under the power of sale contained in the contract of pledge appended to the note in suit. And, upon such sale, the proceeds should have been credited promptly as a payment, *pro tanto*, upon the principal note. The fact that no such credit was made at the time is a circumstance, as in the case of the $10,000 note, which goes to show that the $4,750 note also was sold as the absolute property of the bank, received with the intent that it was in part payment of the note in suit.

In the middle of the year 1925 plaintiffs induced Mr. Viles, then president of the American Savings Bank, to indorse upon the note in suit credit of payment of $4,125, the proceeds of sale of the Martin note. And plaintiffs at the trial indorsed upon the note in suit a further credit of $600 derived from the sale of the pledged dia-

mond. The only justification of this transfer of credits from the $4,-750 note to the $14,750 note was upon plaintiffs' theory that the former was collateral to the latter. Under this state of the facts and the law it would seem that it makes small difference in dollars and cents whether plaintiffs are right in their contention that the two notes for $10,000 and $4,750 were merely collateral to the note in suit or whether defendant is right in stating that there was evidence tending to show that the two notes in fact were given and taken in payment of the note in suit. Both notes, short $76 were paid. This is especially true if we take into account the payment on February 7, 1921, by Rogers to the American Savings Bank of $1,418.82, of which payment we have taken notice.

But there was evidence tending to support the defense of payment of the note in suit by the two smaller notes of equal total amount. The books of account of the American Savings Bank so indicated. In addition W. W. Viles, a stockholder, who became president of the bank after it was reorganized, testified that he was present during the examination of its assets by the Finance Department following the suspension of the bank in November, 1923. The plaintiffs also attended the examination. The note in suit was not found nor mentioned during that process. The only note of the Rogers series remaining in the bank was the one for $4,750. When Mr. Viles became president he had recourse to all instruments and evidences of debt in the bank. But he did not discover the note in suit. In fact he first heard of that note sometime in 1925 when plaintiff Bert Ellis brought it to him and requested Mr. Viles to indorse upon it the credit of $4,125 realized from the sale of the Martin note, part of the collateral pledged with the $4,750 note and originally pledged with the note for $14,750. The absence of the note from the American Savings Bank during the closed period of reorganization beginning in November, 1923, and ending in January, 1924, and thereafter during Mr. Viles' presidency until plaintiff Ellis brought in the note in the middle of 1925 cannot be explained except on some theory consistent with the payment of that note by the two notes of smaller amounts.

In State Bank of Wellston v. Hafferkamp, 315 Mo. 465, 287 S. W. 331, l. c. 335, RAGLAND, J., in searching for the intent of the parties in the delivery of certain notes, whether as payment or as collateral of preexisting notes (the case here) observed: "The fact of foremost importance is that the bank never surrendered the Hafferkamp notes, but retained them in its possession and at all times treated them as live and subsisting obligations." In this case there is substantial evidence that at least from the time the American Savings Bank closed in November, 1923, until the middle of 1925, when plaintiff

Ellis produced the note for a notation of credit by Mr. Viles, the new president, the note in suit was not in the possession of the bank nor was there any color of its ownership by the bank. And the record is devoid of any evidence of transfer by the bank to the plaintiffs, save by the indorsement hereinafter mentioned.

It is true plaintiff Ellis testified that the note in suit was in the bank at all times up to the day that Ellis requested Mr. Viles to credit the payment mentioned. But the testimony merely raised a question of fact between Ellis and Viles. Besides, plaintiff Ellis testified that the two notes for $10,000 and $4,750 took their places in the working files of the bank when they came in and the note for $14,750 thereupon was laid aside. And, he testified, when he looked up the note in 1925, for the purpose of having Mr. Viles to enter a credit upon it, plaintiff Ellis found the big note where discarded, inactive papers were kept. In the case of Citizens Bank of New Franklin v. Gaines, 278 S. W. 784, the Kansas City Court of Appeals held it to be some evidence of payment of one note by another that the note which defendant alleged had been paid "was placed on a 'sticker' file and put among other discarded papers of the bank."

Further evidence that the note in suit was out of the bank in 1925 and since the bank closed temporarily in November, 1923, and the note had been paid by the smaller notes, so far as the bank was concerned is that, by the testimony both of plaintiff Ellis and President Viles, the latter, at the request of the former, not only credited upon the note in suit the payment of $4,125, but he also indorsed the note without recourse on the bank and delivered the note to Ellis. This he did for no consideration except the promise of plaintiffs to pay the balance of $76 due on the $4,750 note. This procedure on the part of President Viles is consistent with his testimony that plaintiff Ellis brought in the note to him for these indorsements. But it is contrary to human experience that Mr. Viles, president of a bank for nothing by way of return, would part with the possession and ownership of a thing of value—and that thing a promissory note for $14,750.

It is also true that plaintiffs in rebuttal put in evidence a letter dated August 18, 1925, written by Rogers to plaintiff Ellis stating his recollection to be that he executed the two smaller notes as collateral for the large note. But that letter bears intrinsic evidence that it was written by request in preparation for the action upon the note which was about to be brought, and also that it was inspired by the hope that plaintiff Ellis would go with Rogers to court in Oklahoma where Rogers had troubles of his own incident to the failure of the National Bank of Picher, heretofore mentioned.

The foregoing and other circumstances in evidence cause us to rule

that the question whether the note in suit was paid by the two smaller notes was for the jury.

VI. There are other assignments of error. One goes to the issue of payment by a transfer of certain land in Buffalo, Dallas County, by Rogers, the maker of the note in suit, to plaintiffs. Another assails defendant's Instruction 9. A third is based upon the refusal of the court to discharge the jury on account of argument of defendant's counsel. We have examined these assignments and do not find in them reversible error.

We are of opinion that the case was fairly tried and that the judgment should be affirmed. It is so ordered. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.