PETER ANTONOPOULOS, Appellant, v. CHOUTEAU TRUST COMPANY and CHOUTEAU MORTGAGE COMPANY.—84 S. W. (2d) 1059.

Court en Banc, July 10, 1935.

*Kratky, Spencer, Soffer & Nessenfeld* for appellant.

254

*Carter & Jones* and *James E. Garstang* for respondents.

WESTHUES, C.—Appellant filed a petition in the Circuit Court of the City of St. Louis, Missouri, alleging that respondents had in their possession certain notes and a deed of trust purported to have been signed by appellant. It was alleged that the notes and deed of trust had been obtained through fraud. Appellant asked the court to cancel the deed of trust and notes and to enjoin respondents from foreclosing the deed of trust. Appellant also asked for an accounting, alleging that respondents had not accounted to him for certain sums of money to which he was entitled. The trial court heard the evidence of appellant only upon the charge of fraud and entered a decree for

respondents, apparently on the theory that appellant had failed to prove any fraud. From this judgment an appeal was taken.

Briefly stated the charges of fraud in the petition are as follows: It was alleged that in June, 1925, appellant negotiated for the purchase of a certain tract of real estate located at 713 North Sixth Street, in the city of St. Louis, Missouri. He agreed to pay the sum of $29,500 as the full purchase price. It was alleged that he was only able to speak and understand the English language to a limited extent. He consulted the defendants and they agreed to act for him in consummating the deal. He paid $3200 in cash and defendants agreed to make a loan to him for the balance of the purchase price. In pursuance to this arrangement appellant was to execute promissory notes, payable on various dates, and a deed of trust on the property to secure the payment of the notes. It was alleged that defendants obtained appellant's signature to sixty promissory notes totaling $30,000, when in fact the total amount of the notes should not have been in excess of $26,300. It was further alleged that defendants fraudulently procured appellant's signature to an additional number of notes totaling $5500, secured by a second deed of trust upon the property. Appellant alleged that he signed all of the notes and the two deeds of trust because defendants represented to him that his signature to the various notes and papers was necessary to complete the transaction of purchasing the building and obtaining the loan for the balance due; that he was unable to read and relied upon defendants' statements as to what papers he was signing. These were the material charges of fraud alleged in the petition. Appellant also charged that defendants had collected rents from the building and that he had paid them various sums of money for which he had not received the proper credits. He, therefore, asked the court to require defendants to account to him for the sums collected and also for the difference between the $30,000 in notes, signed by him, and $26,300, the sum actually advanced, by defendants, for his benefit.

Respondents filed an answer in which the execution of the notes and deeds of trust, mentioned in appellant's petition, were admitted. Respondents also admitted that they had caused a notice of sale to be published, advertising appellant's property for sale on June 6, 1929, for the purpose of satisfying the payment of the notes described in the second deed of trust. All charges of fraud were denied.

During the hearing of the case the trial court limited the introduction of evidence to the charges of fraud, stating that if the fraud charges were sustained then the court could decree an accounting. If, however, the charges of fraud were not sustained then the case would be at an end. At the close of the evidence, offered by appellant on the charges of fraud, the following occurred:

"Mr. Walther: I ask that the plaintiff's bill be dismissed. They haven't proven any charge here.

"The Court: Put on your defense. We don't sustain demurrers in these equity cases. Put on your defendant and see what he has to say.

"Mr. Walther: Well, they have rested. Now, I present—I refused to put—I am not going to put on any proof.

"The Court: That will be all of the proof in the case?

"Mr. Walther: Yes. And then I make a request for a dismissal of the plaintiff's bill.

"The Court: All right. The matter will be taken as submitted."

Subsequently the trial court dismissed plaintiff's bill or petition without hearing any further testimony.

Appellant testified in his own behalf. Preliminary to the examination with reference to the merits of the case he was fully questioned as to his ability to read and speak English. Counsel on both sides and the court took part in this examination. We feel that the witness's lack of knowledge of the English language was at least somewhat exaggerated. Nevertheless his examination on the merits of the case definitely disclosed that it was difficult for him to comprehend the meaning of many of the questions asked and at times it was apparent that he entirely misunderstood what was said. The evidence disclosed that appellant was born in Greece and came to the United States in 1906. He did not go to school in this country. He associated with people of his native land and spoke their language. It was, therefore, difficult to ascertain the true meaning of appellant's evidence. Piecing together the fragments of his testimony his story in substance was about as follows: Appellant became interested in buying the property located at 713 North Sixth Street. He evidently first discussed this matter with a man named Trueblood, who apparently represented the owners of the property. Drake brothers, the owners, lived in various parts of the country—New York, Florida and the State of Washington. After this first negotiation appellant's brother accompanied appellant to the Chouteau Trust Company, the offices of respondents. There he was introduced to an officer of respondents by the name of St. Jean. It may be gathered from the record that appellant had been at the trust company prior to this time with reference to the purchasing of this building. Appellant maintained that his brother did the talking for him and that at this time it was arranged that he, appellant, was to pay $2700 cash and the balance of the purchase price was to be borrowed from the Chouteau Trust Company. Appellant stated that he was told to return the next day and sign the necessary papers to complete the deal and also the necessary papers for the loan. Appellant returned the next day but was not accompanied by his brother. On this day appellant was asked, by St. Jean, to sign certain papers

which he was informed would be necessary to complete the sale and to obtain the loan from the trust company. Appellant testified that he was led to believe he was only signing such papers as pertained to the sale and loan as per the arrangements of the day before. He testified that he did not learn that he had signed a second deed of trust and the notes therein described, amounting to $5500, until a few days prior to the filing of the present suit. He also claimed that the first deed of trust and notes should not have been in excess of $26,500. A treasurer's check in the sum of $29,751.42, dated September 16, 1925, issued by the Chouteau Trust Company and indorsed by appellant and Drake brothers, was introduced in evidence.

The exact purchase price of the property was left somewhat in doubt by the record. Viewing appellant's evidence from any angle it was not in excess of $30,000. Appellant's evidence disclosed that he had paid Trueblood $500, evidently to bind the bargain. He paid over to the trust company, for Drake brothers, $2700 in cash and signed the first deed of trust and notes above referred to in the sum of $30,000. He also signed the second deed of trust and notes in the sum of $5500, making a grand total of $38,700, in exchange for which appellant testified he received a deed for a building for which he agreed to pay $28,000. Of this total of $38,700 Trueblood was paid $500. The trust company, therefore, received cash and notes totaling $38,200. Of this amount, appellant received only $29,751.42, as evidenced by the treasurer's check referred to above. This would leave a balance of $8,448.68 unaccounted for by the evidence. This amount of course is entirely too large to have been absorbed by incidental expenses and commissions.

Respondents in their brief maintained that the charges of fraud were not proven by the evidence. To this we cannot agree. The uncontradicted evidence shows that appellant, a man unable to read the English language, was led to believe, by respondents' agent, that he was signing notes and a deed of trust for a loan sufficient to pay a balance due on the purchase price of a building which in any event should not have been in excess of $28,000, when, as a matter of fact, the agent of respondent procured his signature to notes aggregating $35,500 and two deeds of trust. In addition appellant paid cash to respondents in the sum of $2700. The evidence shows that in consideration for these notes and the cash appellant received only $29,751.42, which was paid over to the owners of the property purchased by appellant. Respondents have cited cases in support of their theory that appellant had opportunity to read the notes and deeds of trust that he signed, or, if he was unable to read, to have had someone read the papers for him and having failed to do so he cannot recover. We do not deem that rule of law applicable. In this case we do not have a charge of fraud because of misrepre-

sentations made by a vendor to a prospective purchaser or vendee as to the value of property where the value of the property could be easily ascertained by the vendee. Nor do we have a case wherein a party, able to read, signed a contract without ascertaining its contents. But we have a banker who had agreed to make a loan of a certain amount. When the papers were signed he procured the borrower's signature to notes aggregating a sum far in excess of the amount of the loan agreed upon. To have misled the appellant in this case was not a difficult task if we take into consideration his inability to write and read English and the fact that he was required to sign numerous installment notes.

What reason would appellant have had for distrusting St. Jean, the agent of respondents? Appellant had arranged for the loan the day previous when his brother accompanied him to the bank. Is the law such that appellant was presumed to know that he was likely to be defrauded and, therefore, redress should be denied him because he did not have someone with him to watch St. Jean? We think not. We quote with approval, from a few cases, statements of the law applicable to this case. In Walsh v. Hall, 66 N. C. 233, l. c. 238, the following statement is found:

"The law does not require a prudent man to deal with every one as a rascal, and demand covenants to guard against the falsehood of every representation, which may be made, as to facts which constitute material inducements to a contract. There must be reasonable reliance upon the integrity of men, or the transactions of business, trade and commerce could not be conducted with that facility and confidence which are essential to successful enterprise, and the advancement of individual and national wealth and prosperity."

In Brown v. Post, 62 N. Y. 651, 1 Hun, 303, we read:

"A person deceived by the fraudulent misstatements of another, owes him no duty of active vigilance in the discovery of the fact that they are false."

[See, also, Forbes v. Thorpe, 209 Mass. 570, 95 N. E. 955; Buckley v. Acme Food Co., 113 Ill. App. 210.] In harmony with the principles of law found in the above cases is the case of State ex rel. v. Bland, 324 Mo. 601, 23 S. W. (2d) 1029, where a review of a number of Missouri cases and an illuminating discussion of the question now before us will be found. The following statement from Judd v. Walker, 215 Mo. 312, l. c. 337, 114 S. W. 979, l. c. 980, was approved:

"It has sometimes been loosely said that the *negligence* of the vendee will prevent recovery for the fraud of the vendor. The word 'negligence' used in that connection, as we understand its meaning in the law of negligence, is an unhappy expression. Fraud is a willful, malevolent act, directed to perpetrating a wrong to the rights of another. That such an act in a vendor should not be actionable because of the mere negligence or inadvertence of the vendee in

preventing the fraud, ought to be neither good ethics nor good law. If one voluntarily shuts his eyes when to open them is to see, such a one is guilty of an act of folly (in dealing at arm's length with another) to his own injury; and the affairs of men could not go on if courts were being called upon to rip up transactions of that sort. . . . *But when an element of willful deception leads up to a transaction, the whole situation changes.''* (Latter italics ours.)

So in this case, the evidence, which respondents have not disputed, disclosed a deliberate deception, by the agent of respondents, in obtaining appellant's signature to the notes and deed of trust of $5500. It may be that respondents were in possession of facts which would have explained the whole transaction so as to disprove the fraud. However, they sat mute. They even declined the invitation of the trial court to come forward and offer an explanation. Under the circumstances, it would seem that if respondents had a legitimate defense they would have been anxious to place the facts before the court to the end that the fraud be entirely disproved. Taking the evidence as disclosed by the record, appellant was entitled to equitable relief. It is evident that a judgment should have been entered, by the trial court, canceling the notes and deed of trust of $5500 and enjoining the threatened foreclosure proceedings instituted by respondents.

This brings us to the question of an accounting. Respondents in their brief suggest that appellant did not except to the ruling of the trial court in rejecting the proffered evidence in support of the accounting, therefore, that question should be out of the case. The trial court's ruling was that the charges of fraud should be first determined and in the event appellant was successful then a decree for an accounting should be made. Appellant acquiesced in this ruling. If, therefore, a decree for appellant be ordered by this court then he should be given an opportunity to offer whatever evidence he may have in support of an accounting. If we had found for respondents on the charges of fraud, then of course appellant could not have an accounting. In other words, we could not reverse the judgment of the trial court, because it denied appellant an accounting, for the reason that the question was not preserved for review. The question of the correctness of the decree upon the fraud charge was properly preserved and that judgment must be reversed. The judgment then, on the fraud charge, will be in favor of appellant and, under the ruling of the trial court, the case should be open for the purpose of an accounting.

The judgment of the circuit court is, therefore, reversed with directions to enter a decree in favor of appellant canceling the note of $5500 and the second deed of trust given to secure the same and enjoining respondents from foreclosing the deed of trust. Also with

directions to enter a decree calling on respondents to account to appellant for whatever sums, if any, to which he may be entitled.

PER CURIAM:—The foregoing opinion by WESTHUES, C., in Division Two, is adopted as the opinion of the Court en Banc. Judgment reversed and cause remanded with directions as specified in said opinion. All concur, except *Coles* and *Leedy, JJ.*, who are of the opinion that said cause should be reversed and remanded.