FLYNN A. McBEE, RESPONDENT v. TWIN CITY FIRE INSURANCE COMPANY AND LYNDE J. REID, Appellants.—235 SW (2) 283.

Springfield Court of Appeals. April 6, 1951.

*Paul E. Carver,* for Appellant Lynde J. Reid.

*Graves & Graves, Phil H. Graves, Jerry P. Graves* for Respondent.

VANDEVENTER, P. J.—This action began as a suit on a fire insurance policy. The defendant, Twin City Fire Insurance Company, a corporation, filed an answer admitting liability but asserting that the plaintiff was claiming all of the amount still due on the policy, that

one Lynde J. Reid was claiming part of it and asked permission to pay the sum into court, be discharged, and that the court order the claimants to interplead for the fund.

Reid filed an answer to the interplea in the first count claiming approximately $2300.00 of the fund paid into court and in the second count he asked reformation of a deed of trust given to him by plaintiff McBee.

Plaintiff McBee filed a reply to the defendant insurance company's answer and interpleader and also an answer to the interpleader of Reid. Upon these issues, the cause was tried and the court found for the Insurance Company, permitting it to pay the fund into court, allowing it an attorney's fee of $175.00 to be paid out of the fund and it was discharged. He found for plaintiff McBee and against interpleader Reid. Reid appealed to the Supreme Court. It was transferred here for lack of jurisdiction. (McBee v. Twin City Fire Ins. Co. et al. (Mo. Sup.) 235 S. W. (2) 283).

Plaintiff's petition alleged that on the 14th day of October, 1948, he paid the premium and received a fire insurance policy on a certain dwelling and contents located on the east one-half of the NW¼ of Section 10, Township 25, Range 31, Newton County, Missouri. $5,000.-00 was on the building and $2,000.00 on its contents; that on the 14th day of December, 1948, while the policy was in force and effect, the building and its contents were completely destroyed by fire and that his loss was $5,000.00 on the building and $2,000.00 on the contents; that due proof of loss was presented and this action commenced within 12 months from date of loss; that demand had been made but the defendant refused to pay. The prayer was for $7,000.00 under the policy and $700.00 punitive damage.

To this petition the Twin City Fire Insurance Company answered, admitted writing the policy but stated that the dwelling house and location thereof were described in the policy as a "1-story cement block, approved roof, dwelling situated on the Southeast Quarter (SE¼) of the Northwest Quarter (NW¼) and the Northeast Quarter (NE¼) of the Southwest Quarter (SW¼) of Sec. 10, Township 25, Range 31, Newton County, Missouri." Defendant admitted that the building and contents were destroyed by fire while the policy was in full force and effect, that the losses were $5,000.00 and $2,000.00, respectively, and that proof of loss had been duly made. It denied that it had refused and still refuses to pay the plaintiff the money under the policy and denied that said delay was vexatious.

By way of interpleader, the defendant company stated that both plaintiff and one Lynde J. Reid were making claims to the proceeds of the policy and that the claims were such that defendant might be exposed to double or multiple liability. It further alleged that McBee

was a resident of Newton County and Reid of Barry County; that on the 14th day of October, 1948, it issued fire insurance policy No. OC5137 for one year from that date on a one-story cement block dwelling, situated on the SE¼ of the NW¼ and the NE¼ of the SW¼ of Sec. 10, Township 25, Range 31, Newton County and $2,000.00 on the household and personal effects in the dwelling. It attached a copy of the policy as Exhibit A. It further asserted that it had paid plaintiff the said $2,000.00 on the personal effects.

It was further alleged that thereafter, on the—day of—, 1948, it issued a standard mortgage clause endorsement as a part of said policy, making the loss or damage, if any, under said $5,000.00 portion of the policy payable to Lynde J. Reid, mortgagee, as his interests may appear; that at the time Reid was the owner and holder of a certain note in the amount of $2300.00 made and delivered by plaintiff to Reid, secured by a deed of trust on the NE¼ of the SW¼ of Sec. 10, Township 25, Range 31; that said note and deed of trust were dated November 4, 1948 and duly recorded. That thereafter McBee detached the mortgage clause from the policy of insurance, claiming the same was issued without his consent and denies that Reid has any interest in said policy or the proceeds thereunder, and that he, plaintiff, is entitled to all of the $5,000.00; that Reid claims the mortgage clause was attached at the request of McBee and that therefore Reid is entitled to $2300.00 of the amount due; that on the 16th day of December, 1948, the building and its contents were destroyed by fire and defendant became liable for the $5,000.00, is ready and willing to pay that amount to whomever is lawfully entitled to it but that McBee is claiming the entire $5,000.00 and denying that Reid has any interest in it, and Reid is claiming that the Company is obligated to pay him $2300.00 under the mortgage clause. It was then asserted that the defendant company is unable to determine which of said parties is entitled to the proceeds and his proportionate shares, and consequently payment could not be made without subjecting the insurance company to the danger of double liability. It asked to be permitted to pay the $5,000.00 into court, that process be issued summoning Reid into court and Reid and McBee be required to answer the interplea and to interplead to determine what amounts of said sum each is entitled to. It asked that it be discharged and that the court award it a reasonable attorney fee to be paid out of the fund.

Reid entered his voluntary appearance, admitted the corporate existence of the insurance company, the issuance of the policy and the amounts thereof and that the property of the insured was described at the time the policy was issued as being located on the east one-half of the Northwest Quarter of Section 10, Township 25, Range 31, Newton County; that later McBee and the Insurance Company by agreement changed the description of the land upon which the property was alleged to be located to the SE¼ of the NW¼ and the NE¼ of SW¼

408

Sec. 10, Township 25, Range 31, Newton County; admitted that the defendant insurance company was entitled to reasonable allowance as attorney's fee to be taxed as costs and paid out of the fund and prayed that the Twin City Fire Insurance Company be allowed and permitted to deposit the $5,000.00 into court and be discharged from further liability.

In Count 2, defendant Reid alleged that on the 2nd day of February, 1948, he obtained a judgment against plaintiff in the sum of $2,000.00, which was of record; that the judgment was a lien upon all of the real estate of plaintiff; that on or about the 4th day of November, 1948, the plaintiff stated to Reid that he was the owner of 80 acres of land situated in Section 10, Township 25, Range 31, Newton County, and proposed to Reid that, in satisfaction of the judgment against him, he give Reid a mortgage, stating that upon part of the tract, to-wit, the NE¼ of the SW¼ was a building referred to as "the night club building"; that the building and the 40 acres upon which it was situated was of the value of several thousand dollars in excess of the Reid judgment with interest; that McBee offered in consideration of Reid's releasing the judgment of record to execute a note for $2300.00, the amount of the judgment with interest and incidentals, and secure it by a deed of trust upon the aforesaid 40 acres, upon which was located the night club building and that McBee represented to him that it was on the NE¼ of the SW¼, as aforesaid. That Reid agreed to this proposal provided McBee would obtain an insurance policy upon said building to protect Reid in the event of its destruction by fire or otherwise, and attach to the policy a standard mortgage or loss payable clause protecting Reid or his assigns; that McBee reported that he had obtained such insurance and agreed to obtain the mortgage clause. Thereafter on the 4th day of November, 1948, Reid by marginal entry released the judgment and concurrently therewith McBee executed and delivered his promissory note for $2300.00 with interest at 6% and also delivered a deed of trust as security for the note on the NE¼ of the SW¼, Section 10 as aforesaid; that this deed of trust was duly recorded; that concurrently with these transactions, the standard mortgage clause was procured and attached to the policy to protect Reid or his assignee, that McBee represented to Reid and to the insurance company that the night club building, covered by the insurance policy and later destroyed by fire, was located upon the NE¼ of the SW¼ and was a part thereof. That the statements and representations that the night club building was located on the NE¼ of the SW¼ of Section 10 were knowingly false and fraudulent, made with fraudulent intent of depriving Reid of the lien of his judgment and induce him to accept in lieu thereof a deed of trust upon lands which were unimproved and of little value; that Reid believed and relied upon the statements and for that reason, released his judgment.

That on the 14th day of December, 1948, the night club was destroyed by fire; that the NE¼ of the SW¼ as aforesaid is an unimproved tract of rough land not worth in excess of $800.00, is encumbered by a mortgage deed of trust of $1,000.00 and is valueless therefore, as security to Reid's note.

That the night club building was actually situated on the SE¼ of the NW¼ of Sec. 10 as aforesaid and that its description as the NE¼ of the SW¼ was entirely due to the fraud and misrepresentation of McBee; that equity and good conscience require that the deed of trust be reformed to describe the land upon which the night club was actually situated. Such reformation was prayed and that Reid be adjudged to have a lien upon the sum deposited in court in the sum of $2300.00 with interest at 6% from November 4, 1948.

Plaintiff McBee filed an amended reply to the insurance company's answer and bill of interpleader in which he admitted having been paid the $2,000.00 covering personal effects, denied any knowledge of or consent to the issuance of the mortgage clause, admitted that it was issued and attached but was later removed by the insurance company's agent; denied that Reid had any right or claim to any of the money and denied that the insurance company should be allowed an attorney's fee.

McBee also filed an answer which amounted to a general denial of Reid's claims, denied any misrepresentation or fraud on his part and asserted that Reid well knew what he was doing when he took the deed of trust upon the unimproved 40.

The case was sent to Greene County on change of venue and was tried in Division One of that court, July 19, 1949.

While this case began as an action at law, by subsequent pleadings, it became an equitable matter. Equitable appeals are decided de novo in this court and it is our duty to reach such a decision, after considering all the evidence and giving due deference to the chancellor's advantage in hearing and observing the witnesses as they testified, as we think should have been made by the chancellor who tried the case. However, the full responsibility here is ours. Smith v. Holdoway Const. Co. 344 Mo. 862, 120 S. W. (2) 894. Hastings v. Hudson 359 Mo. 912, 224 S. W. (2) 945. Murr et al. v. Maxwell et al. (Mo. App.) 232 S. W. 219.

While in close cases we must recognize the due deference rule, it does not require us to blindly follow the decision below. Where the evidence is close and it is difficult to ascertain the true state of facts, where the scales are evenly balanced, the privilege of hearing the testimony and observing the witnesses while testifying may be the grain of sand that tips the scales to a winning side. That is the basis of the due deference rule. But, after considering the advantage

enjoyed by the chancellor, if a careful consideration of all the evidence convinces us that a wrong decision has been made, we must not follow the easy way and affirm the judgment. Clinic & Hospital v. McConnell et al. (Mo. App.) 236 S. W. (2) 384. We have reached the conclusion that the judgment below should not have been rendered and at the risk of prolixity will state the evidence in detail and the reasons for our decision.

Lynde J. Reid was the first witness. He testified that he is a farmer and lives at Monett; he had known plaintiff McBee about five years. At one time Reid had owned a wholesale beer agency and McBee a night club and Reid had sold him beer. McBee gave Reid a check for $2,000.00, which for lack of funds was not paid when presented at the bank and later, February 2, 1948, Reid's claims against McBee on it were reduced to judgment in the Circuit Court of Newton County. He never saw McBee any more until about July or August, 1948, when McBee came to Reid's home at Monett. Reid's wife was present at the time. McBee had previously called and talked to Mrs. Reid on the telephone and stated that he was coming over and he later did come and told Reid that his hands were tied because of this judgment. He further stated that he had a night club which he had remodeled and was living in; that he had moved a Camp Crowder building out on his other forty acres of land and he wanted to borrow $1,000.00 from Reid and to secure him, to give him a mortgage on the property and Reid was to release the judgment. He told Reid that he had paid for and obtained his beer license; that he could get $5,000 insurance on his home, which had been the old night club and that he intended to start a new night club. Reid told him he would think it over. In about a week, McBee came back and offered to give Reid a second mortgage on the night club and take out $5,000.00 insurance. Reid refused to lend him any money. There was already a $1,000.00 deed of trust on the property, so he told Reid, with some interest. McBee stated that if he could get Reid to release his judgment on his 80 acres of land and take a deed of trust on the 40, upon which the night club was located, subject to the $1,000.00 deed of trust to a Mrs. Smith, that he, McBee, could borrow from the bank at Granby $2,000.00 on the free forty. McBee suggested that they go over and see Mrs. Smith and Reid agreed to come over the next day.

Pursuant to the agreement, he drove over to McBee's house and they went to Mrs. Smith's home at Richey. Mrs. Smith stated she would be glad to take her $1,000.00 with interest. Later the witness saw McBee and told him that he would like to have the abstract brought down to date and was informed by McBee that Mrs. Smith had the abstract. It was obtained and Reid told McBee to call him on the telephone when the abstract was brought up to date. Reid then took McBee back to his home, where he said he was living with his

wife and four children and which was the old night club, remodeled, and a week or two later, Mr. Emory Medlin, an attorney of Monett, received the abstract. Reid went down to Mr. Medlin's office and got the abstract and later McBee told him that he had procured the $5,-000.00 insurance. Reid refused to go through with the deal until the policies were received and was informed that McBee had applied for the insurance, had a receipt for it, which showed that he had taken out a $5,000.00 policy of insurance on the house and $2,000.00 on the furnishings. Reid then told him to call him as soon as they got the policies and they would proceed with the transaction.

A few days later McBee called Reid on the telephone, told him he had been to Neosho and the Insurance man told him that the policy "should have been there yesterday" and asked Reid if he could come over. McBee showed the abstract to Reid and pointed out on the plat of the land where the building was located. The abstract described the NE¼ of the SW¼, Section 10. He then showed Mr. Reid the property which he told him was on the 40 acres upon which Reid was to receive the deed of trust. He explained to Reid how the road ran and where on the forty the house was located. He even pointed to a dot or line on the plat of the forty acres stating that was the location of the house. Reid told him that if he would bring the abstract up to date and there was nothing against the land but Mrs. Smith's mortgage and he would furnish the insurance policy that the deal could be completed. In looking at the abstract, Reid discovered that McBee's ex-wife had obtained a judgment against him for $100.00 per month in a divorce suit, and suggested that he get a release from her as to the judgment on the 40 acres upon which Reid was to take the mortgage. McBee said this judgment didn't affect the land, tried to convince Reid that such was a fact, but finally agreed to go for advice to the office of Mr. Wayne Slankard, an attorney, who had represented McBee in the divorce suit. Mr. Slankard informed McBee that the judgment was a lien on the property and that the best thing he could do was get his ex-wife to sign a release of her judgment as to the 40 acres upon which the deed of trust was to be placed.

Mr. Reid again told McBee to go get the policy. McBee left and then came back and told Reid that the policy had not arrived but would be here in a day or two. Mr. Slankard in the meantime had drawn up a release for the ex-Mrs. McBee to sign. They then went from Mr. Slankard's office to the office of Mr. Justin Ruark, another attorney in Neosho, and one whom Mr. Reid had been advised to consult. They presented the proposed release drawn by Mr. Slankard to Mr. Ruark, who read it and carefully considered it. Reid explained to Mr. Ruark in the presence of McBee that he wanted to take a mortgage for $2300 on the 40 acres upon which McBee's home, the former roadhouse, was situated; that McBee had insured the building for

$5,000.00 but the policy had not arrived and there was also a question as to his ex-wife's alimony judgment. After reading the release, Mr. Ruark decided to prepare another one, more in detail, which he did. McBee informed Reid he would have to get his wife in a certain mood before she would sign it. Reid told him when she signed it to call him up.

In a few days McBee called and Reid drove to McBee's house, picked him up and went back to Mr. Ruark's office in Neosho, and told him what they had come back for. Mr. Ruark asked if they had the insurance policy and was informed that it had not yet arrived. Mr. Ruark then ascertained from McBee who the agent was that was writing the policy, called him, a Mr. Thomas E. Day, and discussed it with him. Mr. Ruark was talking over the telephone in the presence of McBee and Reid at McBee's direction. Mr. Ruark, in the conversation, gave the insurance agent Mr. Reid's full name, spelling it out, and then told the agent that it would be all right if he would send the policy over to his office on the morrow. Mr. Ruark told the agent to attach a standard form mortgage clause to the policy in favor of Mr. Reid and then send it over to his office. Mr. Ruark then prepared a note for $2300.00 and a deed of trust securing it, which were delivered to Mr. Reid in the presence of Mr. McBee. In Mr. Ruark's office they discussed the property that McBee's home was on and it was understood that was the property upon which the mortgage was being given. Mr. Ruark, after McBee had described it, remembered having seen the building and that it had a stucco finish. The deed of trust was then taken over to tthe court house, signed and acknowledged before Glenn Morgan, Circuit Clerk, and Mr. Reid released the judgment for $2,000.00 that he had previously obtained against Mr. McBee. It was agreed that the note and mortgage should be in the amount of $2300.-00, which included the judgment for $2,000 accumulated interest and some attorney's fees that Mr. Reid had paid Mr. Medlin for representing him in procuring the judgment.

The circuit clerk seemed to be confused as to what they wanted done and it was explained to him by Reid, in the presence of McBee, where the old night club used to be, called "The Gaiety" and told him "We are putting a mortgage on that." Mr. Reid received back the $10.00 filing fee he had put up when he brought the suit on the check. They then went to the Recorder's office, recorded the deed of trust, both releases and paid the recording fee. The note and deed of trust were introduced in evidence. The note secured by the mortgage or the judgment had not been paid at the time of the trial.

On cross examination Reid denied telling Mrs. John W. Smith that he had a mortgage or deed of trust on the 40 acres without any improvements on it, neither did he tell her that he tried to get a mortgage on the night club forty but couldn't as Mrs. McBee owned a

half interest in it and would not sign the mortgage. His wife was present during the conversations at Reid's home in Monett at the times McBee came there to discuss the release of the judgment and the giving of a deed of trust. Reid thought, and McBee told him, that the deed of trust was being given on the 40 acres upon which McBee's home was located, the home being the remodeled night club.

When McBee first came to Reid's home in Monett, he told him that he and Mrs. McBee had re-married but later on, he told Reid that they had not re-married, although his folks and his ex-wife's folks and everybody in the neighborhood thought they were. When Reid was at McBee's night club home, he didn't go in the building, but he saw the children going in and out, there was a dog and cat near and smoke was coming out of the house, so he presumed they lived there.

In July, 1946, Mrs. Reid had loaned McBee $1200.00, secured by a deed of trust, on a piece of land but witness didn't know the description.

Mr. Justin Ruark of Neosho, Missouri, who had been practicing law since 1923, as a witness for plaintiff testified that he was slightly acquainted with Mr. McBee and was acquainted with Mr. Reid. He stated that McBee and Reid had come to his office twice, to discuss the execution of a mortgage. In telling of the occurrence, Mr. Ruark said:

"This was in the fore part of November. I don't recall the exact date. Mr. Reid and Mr. McBee came to my office together. They said their purpose was to have a mortgage drawn, but they said they were in some difficulties in getting it straightened out. They explained to me, both of them present at the time, part of the time one of them talking and part of the time, the other, that Mr. Reid had a judgment against McBee and that McBee was trying to get it off part of his property so he could borrow money on the rest of it; that Reid had agreed to take a $2300.00 mortgage on what they called the night club forty, and in return for that, Reid was to release the judgment.

"They had with them a paper which amounted to a release of a judgment which had been obtained by McBee's ex-wife. I made some objections—I don't recall what it was—to that release, and wrote them another one. Then, there was further discussion about the making of the mortgage, but I don't recall whether I wrote the mortgage on that occasion or the second occasion. They were there, twice, either on the same day or possibly following day."

Mr. Ruark then identified the release as defendant's Exhibit 4. As to what occurred on the day he drew the note and deed of trust, he stated:

"On that occasion—as I say, I don't recall which time it was—they had an abstract with them. They *layed* it down on my table, and mentioned this night club, or where a night club had been.

Both of them got a little impatient with me, because I misunderstood them, thought they were trying to take a mortgage on what we call Camp Elwood. And I was interested in that, because of some previous litigation. They corrected me, told me that wasn't the property involved. McBee told me that his place was down on around the curve of the road, and he had that same abstract that you had here a moment ago, and pointed it to me, showed me how the road ran and pointed to a place on there and said that was his property.

"Q. I will ask you to explain, Mr. Ruark, what you mean by 'his property.'

"A. They were talking about taking a mortgage on a night club building, Mr. Carver. As I say, I misunderstood when they first started to tell me which night club it was. McBee took the abstract and said, 'Camp Elwood is up here. My club is on down here.' He had a little—I don't know whether he had a pencil or key, or something—and he drew how the road ran across there, in front of the property.

"Q. I will ask you whether or not he identified the location of the night club property.

"A. Yes, he pointed to that place there and said that is where the night club was." * * * *

"Q. (By Mr. Carver) Now, Mr. Ruark, I will ask you whether or not at the time this note and deed of trust was drawn in your office whether or not there was any conversation concerning insurance.

"A. There was.

"Q. Please tell the Court what that was.

"A. Mr. Reid was reluctant to go ahead until he obtained the insurance policy. And Mr. McBee told me that the insurance had been obtained, but it hadn't come in yet. And Mr. Reid said, 'Well, I think I ought to have the insurance policy, if I am going to release that judgment,' or in substance that. And I said, 'I think I can fix that. We can call the agency and they can put a loss payable clause in, and when the policy comes in, you can have it. So I asked Mr. McBee who he got the—what agency he got the insurance from, and he didn't seem to be able to give me the name, but he told me the location, and I knew where that would be. Then, I called him, Mr. Day, and I told Mr. Day then, over the phone, in the presence of Mr. McBee and Mr. Reid, that they were there; I understood that Mr. McBee had obtained insurance on his night club property; Mr. Reid was making a loan on it for $2300.00; and that they wanted a loss payable clause put on it, and asked him if he could do that for us. He said he could; and asked me to give him the correct spelling of Mr. Reid's name, and the address. I did, I spelled out the name. I had to

stop, I believe, and ask Mr. Reid his address, and gave that to the insurance agent.

"And then, either then or later—I believe it was then—the agent asked if it would be all right just to send the policy up to me, and I said it would be.

"Q. I will ask you whether or not at any time while in the presence of you, Mr. Reid, and Mr. McBee, there, Mr. McBee ever denied that there was not to be a mortgage on the night club building?

"A. He not only didn't deny it, he gave me to understand this was, this property which he handed to me to take the description from, was what they called the night club forty."

On cross examination, Mr. Ruark denied that Mr. Reid had ever told him that he had tried and failed to get a mortgage on the night club property; that he took the description from the abstract, which he did not examine otherwise and that McBee told him to call the insurance people about the mortgage clause and he did so in McBee's presence. After the fire, it was learned that the destroyed building had not been on the land described in the deed of trust. When McBee and Reid left his office, they took with them the note, deed of trust and both releases.

Mr. Thomas E. Day, local agent at Neosho for the defendant Twin City Fire Insurance Company, testified for Mr. Reid. He had been in the insurance business there 20 years and was acquainted with Mr. Justin Ruark and also with plaintiff McBee. He identified the insurance policy, also the standard mortgage clause form, No. 127-B, in favor or Lynde J. Reid and a credit memorandum, dated October 14, 1948, showing a payment of $63.00 premium, and also showing on its face that the policy had been ordered by "Mr. McBee Lynde J. Reid".

The policy was dated October 14, 1948. Defendant's Exhibit No. 7 was an endorsement on the policy showing a correction of location. It showed the policy was corrected to show SE¼ of the NW¼ and NE¼ of SW¼ Section 10, Township 25, Range 31. The witness made the correction at the request of Mr. McBee. The original policy stated the building was situated on the east half of the NW¼ of Sec. 10, Township 25, Range 31. The mortgage clause was dated November 5, 1948, and he had been notified over the telephone by Mr. Ruark on the 4th to attach it to the policy.

"Mr. Ruark identified himself as Mr. Ruark, asked me if I had a fire insurance policy there in favor of Mr. Flynn A. McBee. And I told him I had made up application for it, but it hadn't arrived. He says, 'We have a deed of trust here secured by a mortgage and we are asking you to put on a 127 mortgage clause on to that.' I said, 'In favor of who?' And he gave me, and spelled it out, the name, L-Y-N-D-E J. Reid, or assignees, Monett, Missouri, and I placed it on there."

Mr. Ruark did not tell him that Reid and McBee were in his office at the time of this telephone conversation but he found it out a few days later. He did not have the policy when Mr. Ruark called him, but it was in force and he had been notified to that effect by a letter from the company. The policy was executed in the home office in Minneapolis. Later the policy was delivered to Mr. McBee. The witness further testified as to what happened at the time McBee came for the policy:

"He came into the office and he said, 'Is my insurance policy here?' And I said, 'Yes, sir.' I handed him the policy, and I says, I am sorry, but I had to attach a mortgage clause 127 to that because Mr. Ruark had called me on the phone to tell me there was a mortgage on it.' He says, 'Why, there is no mortgage on that.' And, 'Who is paying for this policy, me or Mr. Ruark?' That rather put me in a position to where I didn't know where I was. I said, 'I reckon you are paying for it,' and give him the policy."

Previously Mr. Ruark called and inquired why the policy hadn't been delivered to him and his secretary called at another time and each was informed that the policy had not yet arrived. The witness further testified that any time he was requested to attach a mortgage clause to a policy, he did so because if he failed to do so and there actually was a mortgage on it, neither the owner nor the mortgagee could recover.

On cross examination the following occurred:

"Q. (By Mr. Graves) Now, this mortgage clause was removed by you and sent into the company, was it?

"A. Not just exactly that way. What he did with his part of the mortgage clause on his policy, I do not know, can't recall. It seemed to me like he took it off, or it seemed to me like he took it out, but when he told me to take that off, he also said, 'You must destroy that.' And I said, 'I have to have an endorsement from the office allowing me to destroy that.' Now, I was in a little particular position, right there. If I should have taken the mortgage clause from that, and they was a fire and destroyed that property, and they was a mortgage on there, that policy would be no effect to the insured or to the mortgagee, so I had to hold that 127 mortgage clause. And I held that mortgage 127 clause, my copy and the office copy, in my office."

The only time McBee ever discussed the mortgage with the witness was the time he picked up the policy. Witness heard of the fire on a radio broadcast.

Mr. Wayne Slankard of Neosho, a practicing attorney for many years, testified as a witness for Mr. Reid. He was acquainted with plaintiff McBee and Mr. Reid. They came to his office sometime in 1948 together. His testimony continues:

"Q. (By Mr. Carver) Mr. Slankard, I will ask you if you recall the conversation in your office between Mr. McBee and Mr.

Reid as to the executing of a note and deed of trust on a piece of property known as the 'Beer Joint?'

"A. Well, as I recall, the conversation was not between them. They were telling me what they were going to do. If I remember right, they were there on two different occasions. The first time, I think that the conversation opened something like this: That Al maybe asked me if this alimony that his wife had was a charge, —I believe he put it—or lien, against the real estate out there. And I explained to him that it was. He apparently was in some confusion about the effect of the judgment that his wife had for alimony as to whether or not it would constitute a lien against the real estate. And I explained to him that it was a lien against it.

"Then, either Al or Mr. Reid,—as to which one, I don't know— they were both there, and they then explained to me that the judgment that Reid had, about which I had knowledge, was being released, and that Al was giving him a mortgage on the place out there, and I think they referred to it as the "Beer Joint.' Well, I then told Al that he would have to get a´release from his wife, if the mortgage was to be a first lien. And if I remember correctly, I think that day I wrote up a release for him to get his wife to sign. Sometime after that,—I just don't recall how long— but within a comparatively short time, they were back in the office and they had a release that Mr. Ruark had prepared. And they explained to me that Mr. Ruark wanted that because he was afraid that the general release I had drawn might be, at some future time, questioned by Al's wife, and that he wanted it specified in the release that it referred not only generally but particularly to this mortgage that Reid was taking.

"Q. I will ask you whether or not at that time they referred to this again as the 'Beer Joint' property, or as to the 'Night Club' property?

"A. Well, I couldn't say for certain that that was even discussed the second time; could have been. But it was discussed on this first occasion, I am sure."

"Al" is a nickname for Flynn McBee.

Mr. Slankard had represented McBee in his divorce suit and he had drawn the original release. Witnesses' testimony further tended to show that in the divorce action between McBee and his wife, the decree (by adopting a stipulation entered into between the parties) gave the wife some of the property and the 80 acres were given to plaintiff McBee. Also the wife obtained a judgment for $100.00 per month for support and maintenance of their children.

Mr. Glenn Morgan, Clerk of the Circuit Court of Newton County, as a witness for plaintiff, testified as to the judgment in the case of Lynde J. Reid against Flynn A. McBee, as appeared from the records

of the Circuit Court of Newton County. He read it to the court. It was a judgment for plaintiff in the sum of $2,000.00 with interest and stated that though defendant McBee was served with a copy of the petition and a summons by leaving them at his home with a member of the household over fifteen years of age, he fails to appear, but makes default and "it being an action upon a certain check given by defendant to plaintiff in the sum of $2,000.00 for good and lawful money, said check when presented to the bank, defendant had no money in said bank and said check had never been paid," therefore judgment was rendered accordingly.

Mr. Morgan further testified that there was a marginal entry in the records of said judgment as follows: "This judgment paid and fully satisfied this 4th day of November, 1948, by Lynde J. Reid, Attest, Glenn Morgan." The clerk further testified that he was acquainted with both McBee and Reid and that he recalled the occasion of them coming to his office on November 4, 1948. He testified:

"Well, as I recall, Mr. Reid and Mr. McBee came in together, and Mr. Reid said, 'I would like to release my judgment against Mr. McBee.' And he also said he was taking a mortgage, I believe he said, on a night club, and at the same time I took Mr. McBee's acknowledgment of a deed of trust.

"Q. I will ask you whether or not there in your presence there was a discussion there as to the mortgage covering a night club?

"A. As I recall, it was. Mr. Reid made the statement that he wanted to release his judgment; that he was taking a mortgage, I believe he said, on a night club.

"Q. I will ask you whether at that time Mr. McBee made any objections as to that statement being incorrect.

"A. No, sir."

He further testified that he made the acknowledgment on the deed of trust and that McBee declared himself to be single and unmarried but McBee never mentioned the description of the land and never told him that it was on a night club but was present when Reid did tell him such and that McBee made no objections at the time. McBee paid for the acknowledgment. Witness further testified:

"Q. (By Mr. Carver) In other words, am I correct in this? That the night club was discussed in your presence there as being part of the security on the deed of trust?

"A. That is the way I understood it, Yes, sir."

Here Reid rested his case and he was recalled for further cross examination.

He testified that he had made no effort to collect his judgment by execution.

Flynn A. McBee, plaintiff, testified that he at no time told Mr. Reid that his deed of trust covered the land upon which the residence-night club was situated. Six or eight months before the fire, he converted

the night club into living quarters and occupied it as his home. He stated that Reid had asked him several times for a mortgage on the land where the house was situated but was informed he couldn't do it because "my wife refused to sign it". He stated that the title to the "front forty", the one with the improvements on it, was in the names, "Melva M. McBee and Flynn A. McBee, I and my ex-wife". That Reid had at one time negotiated a loan for his wife on that particular forty. He denied telling either Messrs. Reid, Ruark or Slankard that he was giving the deed of trust to Reid on the home forty. He denied telling anyone that the little line on the abstract designated the location of his night club. He testified that Reid knew he was taking a deed of trust on the unimproved forty. He denied ever authorizing anyone to put a mortgage clause on the fire insurance policy and that the first he knew of it was when he "went to pick up the policy" at Mr. Day's office.

On cross examination he stated he was at the time of the trial living at Joplin and he had not remarried his ex-wife. He claimed the judgment against him in favor of Mr. Reid was rendered without his knowledge and he was not notified. There was already a mortgage on the south forty for $1,000.00 to John W. Smith and wife. He had paid three installments on the alimony judgment and quit. "I started keeping my children up, which was running $150.00 to $175.00 a month." There were no improvements on the south forty, it was "mining land", smooth with 23 acres in cultivation. Good fences all around it, with a road on the south side. "I did not tell Mr. Ruark, or Mr. Reid, I was giving him a mortgage on my home, or a night club, Mr. Carver, Mr. Reid knew what he was getting." He denied being present when Mr. Ruark called Mr. Day and told him to put the mortgage clause on the insurance policy. He went to the insurance office and got the policy from Day in a few days after the meeting in Mr. Ruark's office. At the time of the divorce action, he and his wife signed a stipulation that she was to get the home in town (Granby) and he was to get the farm, that is the home eighty acres. That was July 9th, 1948. The residence-night club was on the eighty acres. He refused to say whether he and his ex-wife were living at the night club when Mr. Reid came out there. He answered: "I think that is my personal affairs." * * * "My family was out there quite a bit."

"Q. (By Mr. Carver) And your wife at that time, she wasn't making any claim to this night club forty, was she? A. No, she was planning to remarry, and we just decided we would just leave it like it was.

"Q. And, also, you never have remarried, have you? A. No."

He later sold the forty (about January 7, 1949) and acknowledged himself as single and unmarried. There was no mortgage on the "front forty". Mrs. McBee gave him a deed to it before he sold it.

420

Mrs. John W. Smith, testifying for plaintiff, said she lived at Richey and she had a mortgage on the same land upon which Mr. Reid had one, which she called the "blank forty". She stated that Mr. Reid told her that Mrs. McBee refused to sign a mortgage on the forty acres with the night club on it. That he had a mortgage on the unimproved property.

"Q. What, if anything, did he tell you to indicate that he knew in that period of time that he had a mortgage on the unimproved forty?

"A. He said that it was not worth the two mortgages, and that he wanted us to assume the second mortgage, being as he had the largest mortgage, and we refused to do it." She testified she turned the abstract over to McBee, took his receipt, and had never seen it since. Further:

"Q. (By Mr. Carver) Now, you recall talking to Mr. Reid over here, do you not? A. Why, certainly.

"Q. And you recall the time that he came up there and told you that you had the mortgage on the back forty and not on the night club, at all.

"A. He didn't say that, but he inferred. The night club was never mentioned between Mr. Reid and I.

"Q. The night club was never mentioned between you and Mr. Reid.

"A. He never, as far as a mortgage was concerned.

"Q. Well, what discussion was there of the night club?

"A. None.

"Q. None.

"A. Other than when he said that Mrs. McBee refused to sign the mortgage on the night club, on the night club forty."

*  *  *  *  *

"Q. (By Mr. Carver) Mrs. Smith, as I recall your testimony, this discussion took place last August, is that right?

"A. About the mortgage?

"Q. Yes. A. Yes."

Mr. Reid, being re-called, stated: That the first time he went to Mrs. Smith's house was when he and McBee first went to see if she would sell the loan, the second time when McBee obtained the abstract, the third time after the fire to get Mr. McBee's address.

"My third trip I went to her (Mrs. Smith) was to get his address, and I told her that my lawyer told me that we were on the wrong forty. And she said, 'Oh, no, I have a mortgage on the night club, first mortgage, and Mr. McBee told me that I would be paid before anyone else.'

"Well, I said, 'I hope you are right, but my lawyer tells me that we are not, we are on the wrong forty.'

"I went back down there the other night, which was night before last, and she said, 'My husband had investigated and he said we are on the wrong forty.' She said, 'My husband told you that.'

"And I said, 'I never met your husband, so he couldn't have told me that.'"

Mrs. Reid testified in relation to one of McBee's visits to her home in Monett and his conversation with her husband:

"He was asking him to take a mortgage. And he told him that the mortgage he could have was on what was the night club place, which they are either living in or were going to live in, and that he had applied for insurance, which he hadn't got yet, that would cover what Dr. Reid had against him, if he would put his mortgage on that place."

She stated in relation to her loan of $1200.00 in 1946, that her husband recommended it and Mr. Medlin, her attorney, handled it for her. She couldn't say whether it was on the night club property or not, as McBee paid it off a year later.

We have outlined the facts in detail upon which we are required to render a decision and do equity between plaintiff McBee and interpleader Reid. The chain of events that lead to this controversy began with Reid cashing a worthless check for McBee in the sum of $2,000.00. It was drawn upon a bank in which McBee had no funds, but for which, according to Reid, McBee received "cash money" and according to the provisions of Reid's judgment, it was given "for good and lawful money." This check was never paid and Reid was compelled to reduce his claim to judgment. The judgment was never paid although the debt is admitted and there is not the slightest evidence, or inference, that the obligation was unjust. Even after the judgment was procured, Mr. Reid patiently refrained from pressing his debtor by having execution issued and selling McBee's land. On the other hand, McBee made no effort to pay, and nothing was heard about the matter until McBee wanted more money. He first tried to borrow an additional $1000.00 from Mr. Reid, (adding insult to injury) but failing in this, he conceived the idea of getting the judgment released as to the north forty so he could borrow $2000.00 from the Bank of Granby and re-establish himself in the night club business. Mr. Reid says he was to get a mortgage and insurance upon the forty upon which the residence-night club was located. McBee says that Reid knew he was merely to get a mortgage on the unimproved forty.

There could be no advantage to Mr. Reid in releasing his judgment, which was a lien on 80 acres of land upon which the night club was situated and taking a deed of trust upon a forty that was unimproved, and, to make his security less valuable, was already encumbered by a $1,000.00 mortgage. If Mr. Reid knew he was taking a mortgage on an unimproved "blank forty" why was he insisting on obtaining an insurance policy? The only evidence we have relative to the "blank

forty" shows that it was said to be mining land, was "smooth"; 23 acres could be cultivated and was fenced. There was nothing on it to insure. To believe McBee's testimony is to disbelieve witnesses Reid, Ruark, Slankard, Day, Morgan and Mrs. Reid. None of them had any interest that could be construed as weakening their testimony except Mr. and Mrs. Reid. If we were inclined to doubt the testimony of Mr. Ruark (which we are not) what conceivable reason would there be for him to falsely testify that the understanding was that the deed of trust was to cover the night club and that McBee authorized him to have the mortgage clause attached to the policy? How would he have known there was a policy or the location of the agency through which it was procured if McBee had not told him? If Reid knew there were no insurable improvements on the forty upon which he was taking a deed of trust why would he have been delaying the deal until McBee insured his building? Further than that, McBee's explanation that Reid was relinquishing the lien of his judgment on all of McBee's land with its improvements and taking in lieu thereof a second mortgage on an unimproved part of it, is so unbelievable as to hardly need contradiction.

Another indicia of fraud is McBee's action in having the description of the land changed in the insurance policy. This, it must be remembered, was done the day after the deed of trust was executed. The original description had been the east one-half of the NW¼. It is conceded by everyone that the night club was located on the south 40 of this east one-half, so this description was not erroneous. The change that McBee procured merely dropped the north 40 of the east one-half, and the forty upon which Reid had his deed of trust was attached. In other words, he dropped a forty upon which the building was not located, and added another forty upon which it was not located. Each description, however, included the forty upon which it was actually located. Then why the change? A reasonable inference to be drawn from the evidence is that this was done to lull Mr. Reid and his attorney, Mr. Ruark into a false sense of security, should they perchance have an opportunity to examine the insurance policy, which eventuality McBee tried to circumvent by immediately getting it himself. With the description as changed, the policy would cover the land upon which the deed of trust was given and it would be impossible for either Mr. Reid or Mr. Ruark to compare the descriptions in the deed of trust and insurance policy and ascertain that the insured building was not located upon the land covered by the deed of trust. Without this change, the discrepancy, in the event of a comparison, would be immediately discerned.

There was no way for Mr. Reid to know that the insured building was not on the land described in his deed of trust without employing a surveyor and then he could not absolutely know unless he followed the surveyor as he ran the lines and saw that the insured building was

within them. No one, in accepting a deed of trust as security, is required to go to such lengths to discover fraud. Antonopoulos v. Chouteau Trust Co. 337 Mo. 252, En Banc, 84 S. W. (2) 1059. Reid had a right to rely upon the representations of McBee as to the location of the building insured. Wright v. Weaver (Mo. App.) 231 S. W. (2) 857. He could read the abstract and become familiar with the legal description of the land but it did not inform him that there were or were not buildings thereon. These representations were about matters peculiarly within McBee's knowledge. The deed of trust upon its face required McBee to keep such buildings as were on the property insured for a sum not less than the amount of the indebtedness and the description in the insurance policy covered the very land upon which McBee represented to Reid the building was situated.

Neither can McBee successfully defend upon the credulity of Mr. Reid. The tendency of modern decisions is to condemn the falsehoods of the tort-feasor rather than the credulity of his victim. Aven v. Ellis 334 Mo. 449, 66 S. W. (2) 828. Conroy's Inc. v. Ratz (Mo. App.) 14 S. W. (2) 465, Selle v. Wrigley 233 Mo. App. 43, 116 S. W. (2) 217. Cantley v. Plattner et al. 228 Mo. App. 411, 67 S. W. (2) 125. 37 C. J. S. Fraud, Sec. 30 (b) Page 274.

The law did not require Mr. Reid to deal with McBee as a rascal. We will not condone fraud because the victim thereof displayed some degree of faith in the integrity of his fellowman.

It is argued that McBee's ex-wife owned an interest in the north forty, would not sign the deed of trust and that therefore, Reid knew he could not get such a deed on it. This theory is not borne out by the evidence. The reasonable inference, from the evidence, is that in the divorce settlement, which was before any of these negotiations, a property settlement was had in which Mr. McBee received the 80 acres of land in controversy and Mrs. McBee received a house in the town of Granby. Mr. Slankard and Mr. McBee each so testified and the abstract introduced in evidence shows that the day the divorce was granted, Mr. and Mrs. McBee, as husband and wife, deeded the NE¼ of the SW¼ "and other lands" to Bessie McWillliams, who in turn, later deeded it back "and other lands", to Flynn A. McBee, as a single man, and while McBee states that the north and improved forty was in his and his wife's name, no record to that effect was introduced and the evidence does not give credence to that conclusion. According to the record, the only 80 acres they owned was the two forties herein referred to. The abstract offered in evidence specifically referred to the NE¼ of the SW¼ as there was no other land to deed. Furthermore, nowhere in the insurance policy, the credit memorandum issued by witness Day, when the policy was ordered or the change of description clause later attached to the policy at the request of McBee, is there any indication that Mrs. McBee has any interest in the night club forty or that anyone else has other than McBee.

The evidence convinces us that Reid did not know that the building was located on the north forty and that Mrs. McBee had no interest in it whatever. The credit memorandum introduced in evidence and dated October 14, bears the notation that the order for the policy was given by Mr. McBee and Mr. Reid. That Mr. Reid would be so interested in procuring the insurance policy, spend so much time waiting for it to be delivered, insist that a mortgage clause be put upon it in his favor and at the same time know it insured nothing on the land upon which he took a deed of trust is inconceivable to reasonable minds.

Another suspicious circumstance is the fact that Mr. McBee hurried down to get the policy immediately upon its arrival and removed therefrom the mortgage clause and denied any knowledge or the request for it to be attached to the policy. He even requested Mr. Day, the insurance agent to destroy the rider. Apparently he obtained it to keep it from falling into the hands, or coming within the observation of Mr. Ruark and Mr. Reid.

The evidence to sustain Mr. Reid is so overwhelming as to stand almost uncontroverted and we are not overlooking the testimony of Mrs. Smith. She stated that Mr. Reid told her that he had taken a second mortgage on the same land, upon which she had a first, and that it was not worth those amounts. This statement was undoubtedly true. But she went further to say that the object of Reid's coming to see her, after telling her the land was not worth the amounts against it, that he said he had the largest mortgage and was trying to get her to assume it. When one is trying to sell a thing, one seldom prefaces the sales talk with the bald assertion that the thing is worthless. She could not remember when this conversation took place, in one place in her testimony, she infers that it was between November 5 and December 15, that it was after the fire, which was December 14, and then that it was in August and later that it was in July or August. McBee's attorney came to her rescue by suggesting that she might be mistaken as to dates and she agreed that she could be, which was very apparent from her testimony, without the suggestion of counsel.

The actions of Mr. McBee from the beginning to the end of this controversy are such as to indicate a planned attempt to fraudulently procure the release of Mr. Reid's judgment. He even tried to induce Reid to accept the deed of trust on the naked forty without procuring the release of his ex-wife's judgment, which was accumulating at the rate of $100.00 per month. The only mistake Mr. Reid made was in believing McBee, when he pointed out the residence-night club and assured him that it was located on the land upon which McBee was getting the deed of trust.

But reposing confidence in one's fellow-man does not bar one from asserting fraud.

By the 8th day of November, 1948, Mr. Reid had his deed of trust on the naked forty, the residence-night club and contents were fully

insured, the mortgage clause had been removed from the policy, the description in the policy had been changed so any discrepancy with that in the deed of trust could not be ascertained, the insurance premium had been paid and receipted for, the deed of trust had been recorded, as well as the two releases executd by Mrs. McBee and the judgment of Reid had been released. Then on December 14, 36 days later, the house and contents were destroyed by fire and the insurance company has paid up in full. Enough money is on hand to liquidate McBee's obligation to Mr. Reid.

This is a just obligation. The money is available to pay it. McBee does not want it paid, but we do. In view of the rule that equity looks upon that as done which should have been done, the deed of trust executed by Mr. McBee in favor of Mr. Reid should be reformed so as to include the SE¼ of the NW¼ of Section 10, Township 25, Range 31, the land upon which the night club and residence was actually located, and Mr. Reid should be decreed a lien upon the fund paid by the defendant insurance company into the circuit court of Newton County and the Clerk of the circuit court, where the fund is now on deposit, should pay from that fund the Reid note with interest as well as the costs of this proceeding. When that is done, the reformed deed of trust should be released.

The judgment of Division 1 of the Circuit Court of Greene County is therefore reversed and remanded with directions that the former decree be set aside, that judgment be rendered for Mr. Reid as prayed, and that the fund deposited in court be distributed in accordance with the views expressed in this opinion. *Blair, J.*, and *McDowell, J.*, concur.